## GAMBRILL *v.* GAMBRILL

[No. 165, October Term, 1948.]

246

*Decided May 19, 1949.*

The cause was argued before MARBURY, C. J., DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Murray MacNabb*, for appellant.

*Michael Paul Smith* and *J. Elmer Weisheit, Jr.*, for appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a decree dismissing a wife's bill for a divorce *a mensa* and granting the husband such a divorce on his cross-bill. He is 46, she is 44. They were married in 1923 and have three children, Mary, Paul and Joan. In October 1948, when the case was heard, the children were 24, 21 and 17, respectively, and Mary had been married for two years. The parties and the three children testified. Judge Murray says, "I am very much impressed with these children. They are fine people, all of them."

After the marriage, the husband says, "I thought for eighteen or nineteen years or something like that, all my life was very happy and I thought we had a very solid

home. I didn't think that this would ever happen to us. * * * probably five or six years ago I noticed some little difference. I think maybe it was about the time my eldest daughter started going out with boys". * * * "During the depression, I couldn't find a job. We were in bad shape. I had to go home and live with my parents, both of us did, and the children. My parents kept us in clothes or to a very great extent". He is now a steam fitter foreman, has been with his present employer sixteen or eighteen years, is a steady worker and makes about $100 a week gross (before taxes), and more for overtime. During the War, working twelve to fifteen hours a night, he made sometimes $200 a week. His War wages enabled him to save enough to pay off the mortgage on their house, owned by the entireties, and build up a joint savings bank account which in 1946 amounted to $5900. "I was making more money than I had ever seen in my life."

The wife and daughters will not say the home was ever happy. Then consider the husband close. They say he gave the wife $30 a week for food for the household and no money for herself. She has no money of her own. When Paul became of age he received about $4000 under his father's grandfather's will, made before Joan was born. To carry out a wish expressed by the testator after Joan's birth, Paul shared his money with Joan by giving her $2000 on July 7, 1948. Mary says of her father, "He gave my mother no money. That's why we had no clothing or furniture in the house. When I started to work I paid her five dollars a week. After I left home my brother went to work and started giving her five dollars. He didn't buy her any clothing and I think he took everything and put it in the bank as far as I know." Joan says, in the last year, "He gave me money when I asked him for it for clothes but I didn't have too many clothes like the other girls had. * * * I haven't any idea what it would be [that he gave her in the past year 'for clothes and so on']. * * * I couldn't tell you [how many new dresses she had last year]. I

have bought a lot myself since I got money from my brother." Her father says he "kept a record" of the money he gave Joan for the eleven months "until she got the money from her grandfather [sic]," $379. Apparently what was left of Joan's $2000 was her only resource, and her mother's after they left home on August 19, 1948. The husband was not bountiful with the wife, and evidently was not in accord with his daughters as to how far $100 a week would and should go toward the mirage of "the other girls."

Mary says, "my father has always been very dominating". He asserted himself and his "rights" with rare tactlessness. His wife and daughters were very fond of the wife's sister, the sister's daughters and a daughter's baby. When Mary started going out with boys her father (and, he says, her mother) complained of her staying out too late at night and of some of the boys who were her friends. If he didn't know when Mary came in sometimes, his wife would tell him. At her insistence, he says, he told one boy that she didn't want Mary to see him any more and the boy left, and he also talked to Mary about staying out too late, to which Mary took exception. Mary wanted to invite a boy from Fort Meade to stay at the house one night. Her father was unwilling because the house was "a small bungalow with three connected bedrooms." Mary asked her mother's sister to let the soldier spend the night at the aunt's house, which the soldier and also Mary did. Her father became angry at his sister-in-law because he thought "she was wrong in keeping Mary over there all night with the soldier there" and in "not notifying" him that Mary was staying there. He says his wife "didn't approve of it either at the time," but said Mary should not have gone there and her sister should have advised Mary. However, eventually he and his wife "differed about that, and my wife took her sister's side and * * * was never the same to me afterwards." He forbade the sister's family—even the baby—to come to the house. On Christmas Eve, 1946, Mary had a pile of Christmas presents

for the nieces. He told Mary "to take them out," which she did, and "my wife accused me of ordering Mary out of the house on Christmas Eve"; he went over to Mary's house and asked her to come back, but "Mary said, no, I won't come back, so from that time on things were really bad."

About January or February, 1946, Mary says, she was at a party with a boy—"I told my mother I would be out at Mt. Washington, and we had to walk [they lived about a mile and a half from the street car] and it was about one o'clock when I got in, and my father got up and started beating me." After this episode Mary left home and went to live with her aunt until her marriage about six months later, when she went to live in a house left her by her great-grandfather.

Judge Murray says: "In this case I think for some reason unconscious and unexplainable, this lady who I think is basically a very nice lady, has reached the stage where a lot of women reach, men for reasons which I am not intelligent enough to describe, have a revulsion for her—sex relationships are repulsive to her. Her age is a little high for that to happen but I believe that is what is happening now. I think he has not been as sympathetic and understanding of that condition as other husbands have perhaps been and perhaps all husbands should be." The same result, for present purposes, would be reached, along less Freudian lines, if it were found that by 1946 she had lost all affection for him, and all relations with him had become repulsive to her, the more intimate the relations the more repulsive.

On a Sunday morning in April, 1946 a bedroom incident occurred, in which he tore her slip off. Thereafter she refused to sleep with him or have sexual relations and slept in Joan's room. On Monday, April 29, 1946, he drew $5900 out of the savings bank account because (he says) he heard on Saturday that she was considering the purchase of a house and he was afraid she would draw out the money for that purpose. Her counsel argues that he must have known that money cannot be

250

drawn from a savings bank without presenting the bank book (which he had), and that therefore his testimony is not to be believed because of one statement known to be untrue. If we should apply the maxim *falsus in uno* to this length, it would be necessary, in this and some other divorce cases, to disregard the testimony of both parties. The wife, Judge Murray says, is obviously deaf but "not very" deaf. Her counsel says she is also somewhat "dumb". When she said she could not tell whether Joan took the commercial course at Towson High School, where she graduated in 1948, Judge Murray said, "Don't you know what courses your children take, what kind of a school course she took?", and she replied, "No, I didn't ask them." But after due allowance for deafness and limited intelligence, and perhaps some (not much) reticence, she is less than candid in her repeated refusals to "remember" things which, from her version, must be unforgettable, *e. g.*, (*a*) the subjects of the endless "arguments" which are her summation of her complaints against her husband and are her excuse for refusal to sleep with him, eat with him, or even to speak to him for almost a year before her final departure from the home, and (*b*) his obvious purpose in the bedroom incident in April, 1946 and one in September, 1947 which she represents as an attempt to smother her. If we were disposed (which we are not) to read the printed record without full allowance for Judge Murray's opportunity to see and hear the witnesses, we should get no further (if as far) than Judge Murray got in his avowed "struggle" to find some way to give the wife relief.

On July 10, 1946, the wife went to a roller skating rink with her daughters and watched them skate. She says her husband "came over drunk and started arguing" with her there and made Joan and her "go home right then and there". He says he "thought they were going there too much and Joan wasn't studying her lessons right". What lessons she had to study in July he does not say. He says he went over about nine thirty, found the air conditions and dust didn't suit him at all, so he

"told Joan to come on home and get out of there." The next day, after he had gone to work, his wife, with Joan, left home with small household effects that they could get into the automobile, and went to her niece's and later to her sister's. She says they moved out "because he was arguing all of the time." Several times in their testimony the wife and daughters say he was drunk, but it is clear from their own testimony that he was not a drunkard and did not drink to excess. The evidence does not indicate that he was ever drunk. Manifestly the skating rink incident furnished the wife no legal excuse for leaving.

In September, 1946, she called the house to talk to Paul, and her husband answered the telephone. He asked her to come back and (she says) said things would be different, arguments would stop and he would give her some money for herself. She went back, and sexual relations, which had ceased in April, were resumed for about a year. She says he gave her $20 a week for herself, but only for three weeks. He says he gave her $10 a week for twenty-six weeks.

On the night of September 27, 1947, the second bedroom incident occurred. She says he tried to smother her. He says he put his hand over her mouth to prevent her from repulsing his advances by crying out and thereby bringing into the room Joan and another young girl who was spending the night with Joan. She does not say that then or at any other time he had intercourse with her by force. The next day she showed her daughters a bruise on her arm. She did not leave his room that night. The next night (she says) or four or five nights later (he says) she slept in Joan's room and has never since slept with him or had sexual relations. She says she was "afraid of him." Judge Murray says: "I believe * * * that all of their difficulties have resulted from his * * * attempts at sexual intercourse and her refusal. I believe, however, that he has a sufficiently hot temper, and maybe most men would have, maybe all men would have, that when under these circumstances his

advances are repulsed his anger is aroused, and * * * I believe from that view * * * that under those circumstances he has exercised excessive force on her and has submitted her to some degree of physical abuse. I believe, however, that that physical abuse does not measure up to the standards considered by the Court of Appeals as justifying a divorce on the ground of cruelty. I do not believe there was such cruelty as to put her reasonably in fear of her life or in fear of bodily injury or in fact subject her to any other result than temporary anger. So that I don't figure you can possibly make out your case on cruelty of treatment, because the cruelty here testified to in my opinion is not of the character and nature that the Court of Appeals says must be present in order to dissolve a marriage. By no stretch of the imagination, as much as I am struggling to help this lady, can I conclude that the cruelty practiced on her and testified to by her is of such a grave and weighty nature as to justify a divorce."

To support her charge of cruelty (and constructive desertion) the wife relies on five incidents in the course of more than two years. The first three were the two bedroom incidents and the skating rink incident. The one most stressed was the result of a somewhat clumsy effort of the husband at reconciliation. On February 28, 1948, she and Joan say, when she had gone out to put his supper on the table and started back out of the kitchen he was coming in and "grabbed" her by the arms and twisted them behind her. Joan beat him on the back to make him let go, he pushed his wife over a chair, went after Joan and struck her with a razor strap and also (they say) hit her in the face with his fist. He says he put his arms around his wife and told her he wanted to talk to her—about reconciliation—and she hit him in the face, and while Joan was behind him, beating him, he "smacked" Joan with the back of his hand and afterwards he struck her once with the razor strap. Mary says she saw bruises on her mother and Joan the next day. Later in the evening, he says, his wife set

up the ironing board in the living room near where he was sitting; he said, "Now that you are cooled off, can I talk to you now?" This second overture proved to be no more soothing than was to be expected. He says she replied, "If you come near me, I will brain you with this electric iron".

The fifth incident was that on August 19, 1948, she, with Joan, without legal excuse, left the house, went to her sister's and has never returned. The day before, when she and Joan were in their room, he came in, asked her to come back to him, to his room, and she refused, saying she was afraid of him. He says she and Joan had been packing ever since Joan got her money on July 7th and she had told him she intended to leave. For many years he had had two pistols, one when he had been a special police officer. When she left him in 1946 she took his pistols with her. After her return she had put them in a cedar chest in Joan's room. About half past six in the morning on August 19th he came into the room, unlocked the chest and took the pistols, he says to prevent her from taking them with her. She says she didn't make up her mind to leave, never thought of leaving, had nothing packed, until he took the pistols from the chest; that's what frightened her because she was afraid of him. It is clear, as Joan's testimony shows, that the pistols were not in any degree a menace to the wife.

Both parties, without corroboration, accuse each other of repeated cursing and other opprobrious epithets during the last two years. In response to questions by Judge Murray, the husband expressed willingness to go back with the wife; she refused.

Cruelty that is not cruelty is not constructive desertion. "Constructive desertion may consist of conduct, other than cruelty, which makes life unbearable. [Citing cases.] But when it consists only of cruelty, the measure of cruelty is the same as when cruelty *eo nomine* is the ground for divorce." *Collins v. Collins*, 184 Md. 655, 663, 42 A. 2d 680, 683. In Maryland the policy of the

law has always been not to grant divorces for light and trivial causes. "Constructive desertion" is not an equivalent of any of the catch-alls which in some states help to attract a nationwide market for a local industry. In this court the latest instance of "constructive desertion" was the case of an educated young woman, who proved to be an envenomed termagant and imperilled her husband's livelihood and impaired his health by circulating groundless scandalous charges, oral and written, against him, his father and mother and most of his family. *Eberwein v. Eberwein*, 193 Md. 95, 65 A. 2d 792. In the instant case the wife is not entitled to a divorce, or the husband barred from one, on the ground of either cruelty or constructive desertion or "excessively vicious conduct" (also alleged in the bill).

The wife was allowed counsel fees aggregating $200 for services below, and after her appeal had been taken $100 for services on appeal. It is contended that these allowances are inadequate. The record shows no appeal from the last order. In the allowance for services below we find no abuse of discretion.

The bill contains an allegation that the husband has taken a savings bank book in the names of both, showing funds amounting to $5000, as well as certain bonds of a similar amount in both names, and proposes to convert them to his own use unless his wife can secure the protection of the court to prevent his disposing of them, and a prayer that he be "enjoined from further removing said money and bonds and be required to account for same." These questions have not been argued, orally or in the brief, in this court. We express no opinion regarding any question of property rights. So far as we lawfully can, we leave all such questions open, as if this appeal had not been taken, including, however, necessarily any question of *res judicata* as to the effect of the decree below or of failure to raise any particular question on appeal therefrom.

*Degree affirmed, appellee to pay costs.*