## FOX *v.* GRANDO

[No. 36, October Term, 1949.]

*Decided December 8, 1949.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*William Saxon* for the appellant.

*Hyman A. Pressman* for the appellee.

HENDERSON, J., delivered the opinion of the Court.

Mollie Grando, formerly Mollie Hardy, on October 15, 1948, filed a bill for specific performance of a contract for the sale of leasehold property No. 1711 Calhoun Street in Baltimore City. After hearing, the Chancellor decreed specific performance, conditioned upon her paying into court the balance found to be due by the Auditor.

The testimony shows that on June 9, 1937, the appellee and her husband, Edward Hardy, entered into an installment contract, evidenced by a filled-in, printed form, for the purchase of the premises, subject to a ground rent of $65, for the price of $2,600. The terms were a down payment of $30, weekly payments of $15, until $200 was paid on the principal, $12 weekly until $600 was paid on the principal, when a "building association mortgage" for the balance was to be supplied by the vendor and a deed delivered. The down payment was made and the vendees went into possession.

The agreement provided that in the event of default in any weekly payment the vendor might, without notice,

consider the agreement as ended, and retain the prior payments as liquidated damages, or, at the vendor's option, enforce the contract. Another clause provided that in the event of default, the vendor might consider the purchaser a tenant and be entitled to the benefit of local laws relating to eviction. There was no provision that time should be of the essence.

The record shows that payments of $15 per week were made until November 6, 1937, and credited in the amount of $8.63 (or $8.75) to "dues", balance to "interest" and "expense". On that date a total of $212.67 had been credited to principal ["dues"]. Thereafter, payments varied between $10 and $12 per week until July 30, 1938, when a total of $409.14 had apparently been credited to principal. The next entries begin October 1, 1938, as "rent", $8 per week, until November 19, 1938, when the entry is "rent" $7.50 per week, or $15 every two weeks, continuing with fair regularity to April, 1941, then at $9 per week to June 20, 1942, then at $15 every two weeks to the date of the decree appealed from.

The appellee testified that her husband left her in November, 1937, after assigning to her, through a straw man, all his right, title and interest in the property. They were subsequently divorced. She testified that some time later she told Mr. Fox, the husband and agent of the appellant who had negotiated the sale, that she could not keep up the $10 payments because her husband had left her; that Mr. Fox insisted that she keep on with the contract and told her just to "keep the interest and expenses going, that he would go along with me." He stated that if the contract were terminated he would lose the broker's commission he had paid. Her account of this interview was corroborated by her brother and her son who were present. They were both definite that Mr. Fox said nothing about her becoming a tenant or losing the money she had paid on the principal. Later, when she saw that he had entered the word "rent" on her book, she said to Mr. Fox: "You put 'rent' in there",

and he replied: "No, you are buying the house on those terms, pay like rent."

Mr. Fox did not deny having a conversation with the appellee in November 1937 as to the payment of interest and expenses. He testified: "She said she could pay for a while only that much. I said that was all right. Things were depressed at that time, you know, and I told her it was all right." He testified, however, that in August, 1938, he had another talk with her, in which he agreed to let her stay in the premises as a tenant at $8 a week, later reduced to $7.50 a week. Other than the entries in the book, he gave no written notice of any intention on his part to terminate the contract. He denied making the statement that she should "pay like rent". He testified that in 1941, he raised the "rent" to $9 a week, and brought proceedings in the People's Court for non-payment of the increased amount. When she was served with notice of the suit, she paid the arrears and continued to pay $9 a week until June, 1942. The suit in the People's Court never went to trial. The mere fact that suit was instituted would not in itself constitute an election to terminate the contract. Nor could such action create a tenancy *ab initio*. *Johnson v. R. S. Construction Co.*, D. C., 80 F. Supp. 749, 751.

In 1942, the appellant listed the property with the O.P.A., stating that Mollie Hardy was a tenant. The maximum rent was listed, in an undated form, at $7.50 a week, the amount payable on April 1, 1941. It was admitted, however, and shown by O. P. A. records, that the appellee protested that she was buying the house and was not a tenant. In 1944, the appellant had an offer for the house at $3,600, and tried to obtain an eviction certificate from the O. P. A. However, the appellee again protested, and although Mr. Fox made affidavit that she was a tenant, the sale fell through. He also admitted that she took down a "for sale" sign he erected on the premises. She produced receipted bills showing that she spent rather large sums on repairs to the roof (1942), cementing the front walk (1947), and paving the

back yard (1948). On the other hand, the appellant paid some trivial bills for repairs between 1937 and 1941.

The record shows that Mr. Fox is an experienced real estate operator, while the appellee is unfamiliar with business matters and possesses less than a fourth grade education. We have no doubt that she was left under the impression that her investment in the property was not to be forfeited. She remained in possession and steadfastly maintained her rights as a purchaser. We take notice, as did the Chancellor, that in 1937 and 1938 the real estate market was in a depressed condition, in marked contrast with conditions obtaining during the war years. Whether the appellant could have insisted that she move out, and retained the payments on principal, is a question we need not decide. See note, 9 Md. L. R. 99. Insofar as the issue is one of veracity, we give weight to the finding of the chancellor, who saw and heard the witnesses, that the appellant's agent, in 1938, waived his right to a prompt payment of the amounts specified in the contract, and that no relationship of landlord and tenant was established. At that time the appellee had an equity of some $400 in the property, and her present equity, as estimated by the chancellor, is in excess of $1,000. She has also spent several hundred dollars in improvements. The case is analogous, on the facts, to *Soehnlein v. Pumphrey*, 183 Md. 334, 37 A. 2d 843. That case also furnishes a complete answer to the appellant's contention that the appellee is barred by laches. The appellee has tendered payment in full of the balance of the principal. Under the decree the appellant will receive due allowance for interest and expenses.

We express no opinion on the question of parties argued in the briefs, as these questions were not raised below. Rule 9, Rules of the Court of Appeals.

*Decree affirmed, with costs.*