## COMPTROLLER OF TREASURY *v.* AERIAL PRODUCTS, INC.

[No. 217, October Term, 1955.]

*Decided July 30, 1956.*

The cause was argued before BRUNE, C. J., and DELA-
PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Norman P. Ramsey, Deputy Attorney General,* and *Edward
F. Engelbert, Counsel, Retail Sales Tax Division,* with whom
were *C. Ferdinand Sybert, Attorney General,* on the brief,
for the appellant.

*William L. Marbury,* with whom were *Frederic S. Cross*
and *Piper & Marbury* on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal by the Comptroller of Maryland, (the
Comptroller), appellant, from an order of the Circuit Court
for Cecil County, allowing a refund of $8,811.12, being part
of a payment of $27,852.51, paid under protest on February
5, 1954, to the Comptroller by Aerial Products, Inc., (Aerial),
appellee.

The appellee was a corporation owning and operating a
factory in Elkton, Maryland, where it produced flares, signals,
fuses and loaded ammunition. Approximately ninety-nine
and one-half percentum of the work of the appellee was for
the production of products required for use by the United
States Government. The controversy here arose out of a
series of contracts entered into at or about the time of the
Korean crisis, whereby certain machinery and equipment was
acquired to be used for the production of goods needed by the
Government. The controversy was whether or not the pur-
chases made under the various contracts between the appellee
and the Government were taxable under the Maryland law
relating to sales and use taxes.

No sales or use tax was paid by Aerial at the time of these
purchases. Sometime prior to February 5, 1954, the Comp-
troller's office sent auditors to inspect the appellee's books.
On or about that date Aerial learned from its attorneys that
the report of the auditors showed sales and use taxes due by
them. Under instruction from its attorneys the appellee for-
warded to the Comptroller the aforesaid payment of $27,852.51,
under protest. Claims for refund were filed with the Comp-

troller. The Comptroller ruled against Aerial on claimed refunds in the amount of $8,811.12. The appellee then appealed to the Circuit Court for Cecil County. From an order of that court overruling the Comptroller, he appeals here.

The claim amounting to $8,811.12 for refund was made up in the following manner. Caption (2) was for the purchase of property under a Navy contract for use in the manufacture of supplies for the Government. The amount of tax, interest and penalty involved was $5,948.49. Caption (3) was for money spent for the purchase of property and services under the Navy contract for modification and repair of equipment owned by the Government and lent to Aerial to use in performing the Government contracts. The amount of tax, interest and penalty there involved was $410.94. The total refund therefor claimed under the Navy contract was $6,359.43. Caption (4) was for the purchase of property under an Army contract for use in the manufacture of supplies for the Government. The amount of tax, interest and penalty involved was $218.86. Caption (5) was for the purchase of property under special tooling provisions of the Navy contract and was generally referred to as the "Tooling Contracts". The amount of tax, interest and penalty involved was $2,232.83.

It was stipulated and agreed between the parties at the Comptroller's hearing that "If claimant is entitled to refund of taxes paid on such purchases under Section 322(k) of the Maryland Retail Sales Tax Act, and Section 370(b) of the Maryland Use Tax, the amount of refund under Caption (2) is $4,378.85, the amount of refund under Caption (4) is $213.70, and the amount of refund under Caption (5) is $1,590.83." At the beginning of the hearing below, the appellee abandoned its appeal from the Comptroller's determination on Caption (5). These contracts were not mentioned in the trial judge's opinion in reversing the Comptroller and Caption (5) is not before us on this appeal. The appellee agrees that the order of the trial judge must be interpreted so as not to apply to the Tooling Contracts.

At the argument in this Court the appellant admitted that there was no evidence under which the Maryland Use Tax

could be collected. The question here, therefore, involves only the Maryland Retail Sales Act.

The appellant contends that, since in appeals from the decisions of the Comptroller, such decisions on appeal are restricted to questions of law only, the trial judge erred in substituting his judgment as to facts for the judgment of the Comptroller. Code, 1951, Article 81, Section 348, provides for an appeal from the decision of the Comptroller to the Circuit Court of the county or to the Baltimore City Court, depending upon where the taxpayer regularly conducts his business. Said Section provides in part: "Such appeal shall be limited to questions of law only, but the Comptroller shall file in the Court to which the appeal has been taken a certified copy of the record of proceedings held before him." In *Comptroller of the Treasury v. Smith,* 205 Md. 408, 414, 109 A. 2d 47, the contention was made that the trial court exceeded its authority under Article 81, Section 348, *supra,* in reviewing the facts. Judge Henderson said in that case for this Court: "It is clear that the Comptroller's findings of fact are final, and the court cannot properly substitute its own judgment. However, questions of fact, in this type of case, shade into mixed questions of law and fact, and courts may consider the facts at least for the purpose of ascertaining whether there is evidence to support a legal conclusion that necessarily involves the drawing of a line." For the same reason the questions here shade into mixed questions of law and fact.

In order for those contracts to be performed it was necessary that certain machinery and equipment be purchased. The appellee lacked the working capital to do this. The Navy contract, under which Captions (2) and (3) arose, originated with a telegram dated June 20, 1951, to the appellee from the Chief of the Bureau of Ordnance of the Navy Department. This advised the appellee that it was awarded the contract providing for the procurement and installation of machinery, tools and production equipment at its plant for the production of 20MM ammunition. Appellee was to procure and install the equipment. All purchases of equipment were to be made in the name of and for the account of the Government. A contract would provide for reimbursement to appellee of

direct cost only for purchase and acquisition of facilities without fee or profit. It was understood that the Government could remove or abandon the facilities at any time. Priority of use of facilities would vest in the Bureau of Ordnance with no rental charge. Facilities would be subject to stand-by provisions for five years with maintenance and stand-by storage, with no cost to the Government. All purchase orders and sub-contracts were subject to Bureau approval.

A definite contract later supplanted the telegram. That contract provided on its cover page that Aerial should furnish and deliver all supplies and perform all services set forth in an attached schedule for the consideration stated therein. The contract related in detail what was intended to be accomplished, and provided in part that Aerial, after obtaining Government approval, by contract with others should acquire, construct and install as necessary for the operation, machinery, tools, equipment and facilities identified in the schedule approved by the Government. It was the intention of the parties that the items of equipment and facilities to be acquired should constitute a production unit capable of loading 1,500,000—20MM Projectiles per month on a one-shift basis. The total estimated cost in the initial contract was $284,521.00.

The contract defined "allowable cost" as constituting "the direct costs incurred by the Contractor in the performance of the acquisition, construction and installation of the facilities under that contract and accepted by the Bureau of Supplies and Accounts (Cost Inspection Service), Department of the Navy, as chargeable to such performance * * *." The contract then provided for use of the facilities at Aerial's plant and that Aerial was under certain obligations to maintain and protect the facilities in stand-by condition. It was the intention of the parties that the equipment and facilities be acquired and installed so as to enable Aerial to establish the production unit aforesaid. Aerial was also required to obtain approval by the Government of the plans and specifications and to seek competitive bids. Also contained were provisions with respect to reimbursement and notice of suit against Aerial. Materials could be inspected at the option of the Navy. The Government retained the right to furnish Aerial with Gov-

ernment owned equipment provided that, if Aerial should be required to cancel any purchase order, the cost of such cancellation, as well as Aerial's own cost, should be allowable elements of cost.

As allowable costs the Government should pay to Aerial full compensation for the equipment, construction and installation of the facilities called for by the contract. Once each month, if approved by a Bureau specified therein, Aerial should submit to an authorized representative of that Bureau an invoice or public voucher showing the cost · incurred by Aerial in connection with the acquisition, construction and installation of facilities. After receipt of such invoice the Government should as promptly as possible make payment thereof, except that a reserve was to be set up to take care of any disallowance which might result from a subsequent payment of certain items not properly allowable.

Under Article 8, "Title," it was provided:

"Any and all facilities which the Contractor may purchase for the performance of its obligations under this contract to acquire, construct and install the facilities shall be purchased in the name and for the account of the Government. *Title to all of the facilities shall be and remain in the Government,* it being understood and agreed that the title to all materials, parts, assemblies, subassemblies, supplies, equipment and other property for the cost of which the Contractor is entitled to be reimbursed under this contract shall automatically pass to and vest in the Government upon delivery to the Contractor for the account of the Government or upon the happening of any other event by which title passes from the vendor or supplier thereof, in the case of any such property which is purchased for the performance of this contract, or, in the case of property not so purchased, upon the allocation thereof to this contract by the commencement of processing or use thereof or otherwise. The provisions of this Article, however, shall not be construed as relieving the Contrac-

tor from responsibility for the care and preservation of such facilities or as a waiver of the right of the Government to require the fulfillment of any of the terms of this contract." (Italics supplied).

There were insurance provisions freeing Aerial from liability for loss of or damage to the facilities. Aerial was to maintain adequate property control records of the facilities and a system for identification of them. The Government retained the right to terminate Aerial's authority to use the facilities or any part thereof, upon receipt of written notice by Aerial. The Government could remove, or direct Aerial to remove, the facilities when Aerial's authority to use had been terminated. There was also a provision for the Government's right of access.

By Article 28 it was also provided:

"All items of Government-owned property furnished by the Government to the Contractor for the construction and installation of the facilities and all items of property acquired by the Contractor, *title to which vests in the Government* under Article 8 are subject to the provisions of this Article and are hereinafter collectively referred to as 'Government Property'. Upon the completion of the acquisition, construction and installation of the facilities, or at such earlier date as may be fixed by the Contracting Officer, the Contractor shall submit to the Contracting Officer in a form acceptable to him, inventory schedules covering all items of Government property not required for or consumed in the performance of the acquisition, construction and installation of the facilities (including any resulting scrap), or not theretofore delivered to the Government, and shall deliver or make such other disposal of the Government property as may be directed by the Contracting Officer. Recoverable scrap shall be reported in accordance with a procedure and in such form as the Contracting Officer may direct. The net proceeds of any such disposal approved by the Contracting Offi-

cer shall be credited to the cost of the work covered by the contract or shall be paid in such manner as the Contracting Officer may direct." (Italics supplied).

The testimony showed that the first stage was the preparation of a schedule of needed facilities by Aerial. The approval of the Bureau of Ordnance was then obtained. Aerial then forwarded purchase orders on its own bill heads to the sellers. On such orders was typed "This material is purchased for the account of the U. S. Government". The orders were signed by the purchasing officer of Aerial. Upon receipt of the shipments Aerial was billed. Aerial paid the bills with its own checks. Aerial then applied to the Government for reimbursement. Reimbursement was then made by the Government. The appellant in his brief states: "It is interesting to note the construction which has been given the phrase 'for the account of the Government' by the Congress in the Renegotiation Act of 1951. Parenthetically, it should be noted that this contract, and all others here involved, were expressly made subject to the Renegotiation Act of 1951. In defining the phrase 'acquired * * * for the account of the Government', the Committee Report of the Committee on Finance, Senate Report No. 92, which may be conveniently found in the U. S. Code, Congressional and Administrative Service, 82d Congress, 1st Sess., 1951, Volume 2, at pp. 1339 et seq. at p. 1345 thereof, makes the following comment: 'As used in the bill, the phrase "acquired * * * for the account of the Government" means acquired pursuant to an arrangement by the Government and the purchaser of such equipment, whereby title to such equipment will, or may, at the option of the Government, vest in the Government.'" Upon delivery of the equipment to Aerial property record cards were filled out on a Government form and copies sent to the proper Government officer. Tags, showing that the equipment was the property of the Government, were placed on the equipment which was inspected by the proper Government official to make sure that the tags were attached. Such procedure was prescribed in the "Manual For Control of Government Property In Possession of Contractors".

The appellee claims that the United States was the real purchaser of the property and services acquired under the Navy contract, and that these transactions were therefore exempt by virtue of Code, 1951, Article 81, Section 322 (f), Maryland Retail Sales Act, and by virtue of the Federal Constitution. Section 322 (f), *supra,* exempts from the Retail Sales Tax: "Sales which are not within the taxing power of this State under the Constitution of the United States." It was said by this Court in *Westinghouse v. State Tax Commission,* 206 Md. 392, 398, 399, 111 A. 2d 661: "Of course, the Government is immune to State and local taxation. *M'Culloch v. Maryland,* (1819), 4 Wheat. (U. S.) 316, 4 L. Ed. 579; *United States v. County of Allegheny,* (1944), 322 U. S. 174, 88 L. Ed. 1209, (the *Mesta* case). In early cases the Supreme Court of the United States gave a rather broad scope of immunity. This immunity has recently been narrowed. *Helvering v. Mountain Producers Corp.,* 303 U. S. 376, 82 L. Ed. 907; *Graves v. New York,* 306 U. S. 466, 477, 83 L. Ed. 927, 931; *Oklahoma Tax Commission v. Texas Co.,* 336 U. S. 342, 93 L. Ed. 721. In the early cases it had been held that because of its economic incidence on the Government the tax was an unconstitutional interference by a state with the functions of the Federal Government. The Supreme Court of the United States has receded from that position. *James v. Dravo Contracting Co.,* 302 U. S. 134, 82 L. Ed. 155."

In *State of Alabama v. King & Boozer,* 314 U. S. 1, 62 S. Ct. 43, 86 L. Ed. 3, decided November 10, 1941, King and Boozer sold lumber to "cost-plus-a-fixed-fee" contractors to be used by them in building an Army camp for the Government. The question for decision was whether the Alabama sales tax, with which the seller was chargeable, and which he was required to collect from the buyer, infringed the constitutional immunity of the United States from state taxation. There, the contracts provided that the contractors were to supply labor and materials and do all things necessary to complete the specified work. The Government undertook to pay the contractors a fixed fee and to reimburse them for specific expenses which included their expenditures for all supplies and materials and also state and local taxes which the con-

tractors might be obligated to pay on account of the contracts. The contracts also provided that the title to all materials and supplies for which the contractors were "entitled to be reimbursed", should vest in the Government upon delivery at the site of the work and upon inspection and acceptance by the contracting officer. The Government contended that for all practical purposes the purchases were really made by the United States and were therefore entitled to constitutional immunity. Mr. Chief Justice Stone, for the Supreme Court, said in that case, among other things:

> "* * * we think all the provisions which we have mentioned, read together, plainly contemplate that the contractors were to purchase in their own names and on their own credit all the materials required, unless the Government should elect to furnish them; that the Government was not to be bound by their purchase contracts, but was obligated only to reimburse the contractors when the materials purchased should be delivered, inspected and accepted at the site. * * * The lumber was sold and delivered on the order of the contractors, which stipulated that the Government should not be bound to pay for it. It was in fact paid for by the contractors, who were reimbursed by the Government pursuant to their contract with it. The contractors were thus purchasers of the lumber, within the meaning of the taxing statute, and as such were subject to the tax. They were not relieved of the liability to pay the tax either because the contractors, in a loose and general sense, were acting for the Government in purchasing the lumber or, as the Alabama Supreme Court seems to have thought, because the economic burden of the tax imposed upon the purchaser would be shifted to the Government by reason of its contract to reimburse the contractors."

In *Kern-Limerick, Inc. v. Scurlock*, decided February 8, 1954, 347 U. S. 110, 74 S. Ct. 403, 98 L. Ed. 546, private contractors constructed a naval ammunition depot for the

United States. The State of Arkansas tried to collect sales tax on certain tractors procured from Kern-Limerick, a local dealer. It was conceded that Kern-Limerick would be liable for the sales tax if the real purchaser were not the Government. In the request for bids and in the purchase order the Government was named as the purchaser of the materials, and the contractor was made the purchasing agent for the Government. The vendors agreed to make demand for payment from the Government by submitting an invoice to the contractors. Title to all materials and supplies was to vest in the Government directly from the vendors. Mr. Justice Reed, for six members of the Supreme Court, held that "* * * it is clear that the Government is the disclosed purchaser and that no liability of the purchasing agent to the seller arises from the transaction." Mr. Chief Justice Warren, Mr. Justice Black, and Mr. Justice Douglas dissented on the ground that the United States could not delegate to private persons authority to buy goods for the Government.

In *Westinghouse v. State Tax Commission, supra,* where we held that Government immunity did not apply and in distinguishing that case from *Kern-Limerick, Inc. v. Scurlock, supra; Johns Hopkins University v. County Commissioners of Montgomery County,* 185 Md. 614, 45 A. 2d 747; and *United States v. County of Allegheny,* 322 U. S. 174, 88 L. Ed. 1209, (the *Mesta* case), it was said: "Here, [*Westinghouse v. State Tax Commission, supra,*] the legal title was in the appellant. Its money was used for the purchase of all materials and to pay all labor in the manufacturing process. It was neither the general agent nor the purchasing agent of the Government. If it had been so intended, such a provision could have been put in the contracts. This was not done. The appellant here was an independent contractor. The Government had the right to refuse to take the materials up until the last minute. If the Government felt that it had title to the property before final payment and acceptance, this could have been provided in the contracts to give the constitutional immunity. If the Government obtained title before final payment and acceptance or, if its lien became a property interest, it would have required insurance on the materials.

The provision in the contracts, heretofore set out, as to the interest of the Government in any insurance carried by the appellant, is similar to provisions in insurance policies protecting lienors."

It is true in the instant case Aerial is not specifically designated as "agent". Here, however, the contract specified that Aerial should purchase all materials "in the name and for the account of the U. S. Government". The Government had no right to refuse to take the materials because it had approved the orders. The agency of Aerial was disclosed to each vendor, although on Aerial's letterheads and not on Government forms, by the statement on the order "This material is purchased for the account of the U. S. Government". The contract also provided "Title to all of the facilities shall be and remain in the Government". As pointed out in the above quotation from appellant's brief, the phrase "for the account of the U. S. Government" has been construed by Congress in the Renegotiation Act of 1951 as the provision whereby title to such equipment will or may at the option of the Government vest in the Government. Here, the contract provided that title passed directly to the Government with no intermediate passage of title to Aerial. Here, as distinguished from *State of Alabama v. King & Boozer, supra,* the Government was bound by the purchase orders because these were approved by the Government before being sent to the sellers. We are therefore of opinion that, although Aerial was not specifically named in the Navy contract as the purchasing agent of the Government, under the contract and testimony it was in fact the purchasing agent and, therefore, is exempt from the sales tax on the purchases made pursuant to the Navy contract and is entitled to the refund of $6,359.43, claimed, with interest and costs.

The appellee admits that the Army contract does not involve agency. It contends, however, that the sales, under the Army contract, here sought to be exempted, were sales to it for the purpose of resale. We will, therefore, recite the provisions of the Army contract and the facts which are pertinent in deciding this resale question.

The Army contract provided in part:

"The Contractor shall, in the shortest possible time, with the approval of the Contracting Officer, acquire (and repair or rehabilitate where necessary), *for resale to the Government,* or manufacture for sale to the Government, the machinery, equipment or other industrial facilities, hereafter referred to as the 'facilities', listed in Schedule 'A', attached hereto and expressly made a part hereof. Such facilities shall be installed by the Contractor in its plant or plants or, if approved in writing by the Contracting Officer, for temporary use in the plants of first tier subcontractors. All such facilities installed in plants of first tier subcontractors will be operated and maintained in the same manner as the facilities located in the Contractor's own plant or plants and the terms and conditions of this contract shall apply to such facilities. It is the responsibility of the Contractor to see that all provisions contained in this contract for the protection of the Government's interest in said facilities will be incorporated in the agreement under which such facilities are so placed. * * * *Title to all property purchased by the Contractor, for resale to the Government,* for the cost of which the Contractor is entitled to be reimbursed as a direct item of cost under this contract, shall pass to and vest in the Government upon delivery of such property by the vendor. Title to all property manufactured by the Contractor, for sale to the Government, for the cost of which the Contractor is entitled to be reimbursed as a direct item of cost under this contract, or for which the Contractor is entitled to payment in accordance with Paragraph 1c of Article III-A hereof, shall pass to and vest in the Government upon delivery of such property by the Contractor. Title to all property furnished by the Government shall remain in the Government. Title to the Government property, whether acquired by the Con-

tractor for the account of the Government, or furnished by the Government, shall not be affected by the incorporation or attachment thereof to any property not owned by the Government, nor shall such Government property, or any part thereof, be or become a fixture or lose its identity as personalty by reason of affixation to any realty." (Italics supplied).

The appellee claims a refund of $218.86 under Code, 1951, Article 81, Section 320 (f), Chapter 2, Section 259 (f), Extraordinary Session 1947, which provides in part: " 'Retail sale' and 'sale at retail' shall mean the sale in any quantity or quantities of any tangible personal property or service taxable under the terms of this sub-title. Said term shall mean all sales of tangible personal property to any person *for any purpose other than those* in which the purpose of the purchaser is to resell the property so transferred in the form in which the same is, or is to be received by him, * * *." (Italics supplied). The appellant, on the other hand, emphasizes the words "any purpose" and contends, because the personal property was bought by the appellee to enable it to carry out the contract with the Government, it was bought for a *purpose other than resale* and is not exempted under Section 320 (f), *supra,* and that under that Section it is only exempted if the sole purpose is for resale. Code, 1951, Article 81, Section 320 (d), defines "sale" and "selling" as meaning "* * * any transaction whereby title or possession, or both, of tangible personal property is or is to be transferred by any means whatsoever for a consideration by a vendor to a purchaser, * * *." The appellant points out that under the terms of the Army contract it is plain that it was the intent of the parties that the equipment and facilities be acquired and installed in order to enable Aerial to establish the production unit, and, therefore, that it was the intent of the parties that Aerial should acquire the property for *use,* which clearly demonstrates a purpose other than resale. He relies strongly on the case of *United Aircraft Corp. v. O'Connor,* (1954), 141 Conn. 530, 107 A. 2d 398. In that case the title was to vest in the Gov-

ernment when the material was paid for by the Government. The company there contended that it made the purchases as agent of the Government, but the Court rejected this contention. In dealing with the question as to whether the purchases were for the purposes of resale, the Court pointed out that the intention of the parties was to be ascertained from the language used, interpreted in the light of the situation of the parties and the circumstances surrounding them. The Court, in denying the exemption, considered the purposes for which the material was acquired. It must be noted, however, that the Connecticut Court there emphasized the fact that Aircraft had the use of the material sought to be exempted before passage of title to the Government. The appellant also stresses the case of *District of Columbia v. Seven-Up Washington,* 214 F. 2d 197, *cert. den.* 347 U. S. 989, 74 S. Ct. 851, 98 L. Ed. 1123, (1954). In that case a bottling company bought bottles and cases and sold them at less than cost in expectation that the bottles and cases would be returned by customers for refund. The Court there held that the bottles and cases were not "acquired for purposes of resale" within the statute excluding from use tax property acquired for purposes of resale, but that cartons which the bottling company delivered to customers with bottled drinks and which were not generally returned, were acquired for the purpose of resale. It was there said as to the bottles and cases not exempt: "It is not a sale in any ordinary sense, whereby respondents' customers buy for their own purposes. As soon as feasible they resell to their customers, and, upon receiving back from them the empty containers, these are returned to respondents for further use. Thus the 'sale' or 'buying' aspect of the dealing between respondents and their customers is overshadowed by respondents' use. We must keep in mind that the statute does not provide that the tax shall not apply whenever there is a resale; it is only when the purpose of the purchase is to resell. The true purpose here is not to resell but to use, even if this use is made possible in part through the form of resale and repurchase." In the instant case there was an actual sale, and use could have been denied at any time by the Government.

It must be noted that the Army contract provides in several places that Aerial shall acquire the facilities "for resale to the Government". Under the Army contract title to the property purchased passed to and vested in the Government "upon delivery of such property by the vendor". It therefore appears that Aerial did not either propose to use or actually use the facilities purchased at any time when title was held by it. We are of opinion that Aerial's expectation or purpose to use the property as licensee after the Government acquired title was not intended, and could not be used, to require taxability under the Maryland Act. The purpose of the Maryland Act in taxing retail sales is to impose the tax on the final purchaser or ultimate consumer and to avoid a pyramiding of the tax. No use was to be made of the purchases before title passed to someone else. We are, therefore, of opinion that not only the letter but the spirit of the Act is met by the construction that the material here is exempt under Section 320 (f), *supra*.

No resale certificates were issued on the equipment purchased under the Army contract. In the opinion of the Comptroller the only reference to the lack of those certificates was the statement that no resale certificate was issued on the purchases made under the Army contract. The absence of the resale certificates was not passed on by the trial judge. In appellant's brief the only reference to the lack of those certificates is the statement "It should be noted that no resale certificates were ever issued on these purchases." During the closing argument of the appellant in this Court our attention was called to Code, 1951, Article 81, Section 329, Chapter 281, Section 268, Acts of 1947, and to Rule 40, Rules and Regulations of the Comptroller, which purport to require, for exemption from sales tax, resale certificates when property is acquired for resale. Rule 39, Section 1 (d), Rules of the Court of Appeals, provides that the appellant's brief shall contain "argument in support of the position of the appellant". This point was not argued in the appellant's brief. Neither Section 329, *supra*, nor Rule 40, *supra*, were mentioned or argued in the appellant's brief and were merely brought to our attention by the appellant in his closing oral

argument here. The point was not mentioned or argued in the appellee's brief and, not being argued in the appellant's brief, was not mentioned in its oral argument. The question, therefore, is not before us here. *Ecker v. First National Bank,* 62 Md. 519; *Davis v. State,* 189 Md. 269, 273, 55 A. 2d 702; *Buttion v. Buttion,* 189 Md. 305, 311, 55 A. 2d 839; *Gore v. Jarrett,* 192 Md. 513, 519, 64 A. 2d 550; *Gambrill v. Gambrill,* 193 Md. 244, 254, 66 A. 2d 387; *Fox v. Grando,* 194 Md. 62, 67, 69 A. 2d 795; *Schneider v. Davis,* 194 Md. 316, 71 A. 2d 32; *Commissioners of Vienna v. Phillips Co.,* 207 Md. 12, 113 A. 2d 89; Rule 9, Rules and Regulations Respecting Appeals to this Court. Compare *Martin G. Imbach, Inc. v. Deegan,* 208 Md. 115, 117 A. 2d 864.

In view of these findings it is not necessary that we consider the question as to whether Code, 1951, Article 81, Section 322 (k), Chapter 281, Section 261 (k), Acts of 1947, applies to this case. The order of the trial judge should be modified eliminating the Tooling Contracts and otherwise affirmed.

*Order modified and judgment rendered for $6,578.29, and order as modified affirmed, with costs to the appellee.*