246 So.2d 447

**STATE of Alabama**

v.

**THIOKOL CHEMICAL CORPORATION.**

**8 Div. 18, 19.**

Court of Civil Appeals of Alabama.

Aug. 5, 1970.

MacDonald Gallion, Atty. Gen., Willard W. Livingston, Counsel, Dept. of Revenue and Asst. Atty. Gen., William H. Burton, Asst. Counsel, Dept. of Revenue and Asst. Atty. Gen., for appellant.

Hubbard & Waldrop, Tuscaloosa, for appellee.

WRIGHT, Judge.

Upon rehearing, the original opinion in this case is withdrawn and the following is substituted therefor as the opinion of the Court.

Appellee, Thiokol Chemical Corporation, hereinafter referred to as Thiokol, received from the Alabama Department of Revenue final assessments of sales tax in the total amount, including interest to June 20, 1965, of $2,066.17. Final assessment of use tax was made at the same time, in the amount of $51,038.37, including interest. These assessments were for the tax period from January 1, 1963 through December 31, 1964.

Thiokol paid the assessments and perfected its appeals. The cases were consolidated for trial, with evidence being presented largely by extensive stipulations of fact and exhibits. Some oral testimony was presented by Thiokol. The matter was first tried before the late Judge Elbert Parsons, who died before rendering a decree. The cases were subsequently set again and were tried on the prior record, together with additional oral testimony and exhibits.

Final decrees were rendered on August 5, 1969. The decrees upheld a small portion of the assessment in both the sales and use tax cases, but largely held the assessments invalid and directed refund to Thiokol of $50,368.11 in use tax, and $1,755.22 in sales tax, together with 6% interest from June 18, 1965. From that part of the decree holding portions of the assessments invalid in each case, the Department of Revenue brings this appeal. The cases are again, by agreement, consolidated for the purpose of appeal.

There is agreement that if the assessments are proper, the amount thereof is correct both as to sales and use tax. The only issue for consideration here is whether purchases made by Thiokol in fulfillment of various contracts in the years 1963 and 1964 were purchases for resale or were wholesale sales to them as a manufacturer of tangible personal property for sale and thus exempt from sales and use tax under Title 51, Sections 786(2) (i) and 787(d) respectively, Code of Alabama 1940, Recompiled 1958.

Since the sales tax and use tax statutes are complementary and are construed in pari materia, the exemption from sales tax would be equally an exemption from use tax. The sales tax applies to retail sales or purchases within the state, and the use

tax applies to retail sales or purchases made outside the state and brought into the state for use by the purchaser. Paramount-Richards Theatres v. State, 256 Ala. 515, 55 So.2d 812; State v. Hanna Steel Corp., 276 Ala. 50, 158 So.2d 906; State v. Natco Corp., 265 Ala. 184, 90 So.2d 385; Hamm v. Boeing Co., 283 Ala. 653, 220 So.2d 257.

The United States Army in 1957 entered into a prime contract with Western Electric Corporation and its subsidiary, Bell Laboratories, for research and development of the Nike-Zeus anti-missile system. Western Electric subcontracted parts of the contract with other companies, including Douglas Aircraft Company, Martin Company and others.

The subcontractors, particularly Douglas further subcontracted with Thiokol for research and development of certain small motors and propellants for the motors. These motors were only a part of the larger missile and its total system.

The subcontract between Bell Laboratories and Douglas was implemented from time to time by purchase orders which upgraded the original contract and kept it current with the overall status of the prime contract. In the same manner, the subcontract between Douglas and Thiokol was implemented at intervals with additional contracts or purchase orders as the overall status of the prime contract and primary subcontracts progressed. In other words, as the project moved from the beginning through its various phases, work requirements changed and so did the subcontracts, both primary and secondary, to fit into the overall program.

The first subcontract with Thiokol was designated by number as 58–602 and was executed in 1957 between Douglas and Thiokol. The scope of work under this contract was the same as that of the prime contract and the subcontract between Douglas and Bell Telephone Laboratories.

The various contracts were on a cost-plus-fixed fee basis or cost-plus-incentive fee. Portions of the contracts involved were confidential or secret and could not be placed in evidence in the trial of these cases. It is not known whether the primary objective of the development of the Nike-Zeus missile was ever accomplished.

It was stipulated as follows:

"* * * Appellant's primary function at its Alabama operation under said cost-plus-a-fixed-fee subcontract is to perform research and development associated with the propulsion units of various missile systems, which would involve designing, developing, making, qualifying, testing, and delivering rocket motors to prime contractors or subcontractors, where they are normally incorporated into an over-all missile system. In performing this function, appellant normally acquires from various suppliers both within the state and without the state of Alabama component parts of the rocket motor, such as cases, nozzles, ignition systems, chemicals, polymers, and shipping containers in performing its contracts. * * *"

Thiokol's operations were performed on the premises at Redstone Arsenal, Huntsville, Alabama. Plant facilities, as well as test facilities, were furnished to Thiokol by the Army without cost.

At the time of the assessments involved, tax years 1963–1964, the work under the original subcontract was about complete, but subcontract DAC 62–226 and other Douglas subcontracts were in effect. There was also involved in the assessment other subcontracts with government contractors or subcontractors engaged in performing work for the Department of Defense in the Missile Program.

It is clear that one of the points in issue in the appeal by Thiokol from the assessments of the Revenue Department was that of governmental immunity—whether Thiokol was immune from state taxes as an agent of the United States Government. During the pendency of the trial below, the Supreme Court of Alabama rendered a de-

cision in the case of Hamm v. Boeing Co., 283 Ala. 310, 216 So.2d 288. The relationship of Boeing Company with the United States Government was similar to Thiokol in this case, except Boeing was a prime contractor. Without further discussion, Hamm v. Boeing Co. settled the issue of governmental immunity in the instant case, and the trial court so stated.

The trial court, in its decree, found that Thiokol's primary function in its Alabama operation

"* * * is to perform research and development associated with rocket propulsion units of various missile systems which would involve designing, developing, making, qualifying, testing, and delivering rocket motors to prime or upper echelon government contractors, who in turn normally incorporate such rocket motors into an overall missile system * * *

"On the other hand, certain contracts for the performance of which appellant purchased materials made the basis of this assessment had progressed to a point that appellant was manufacturing and delivering a fully developed rocket motor to its upper eschelon subcontractors. Materials acquired by appellant for the performance of this phase of such contracts are, in the opinion of this court, exempt from the applicable tax, since such purchases are wholesale sales as defined by the statute. * * * *"

This finding is the point of error charged by the Department of Revenue on this appeal.

Since the Thiokol-Douglas contracts are typical of all others involved and constitute the basis for most of the assessment, and were involved in the Nike-Zeus project, we will discuss them as representative of all.

We wish to make clear that each of these contracts was merely a continuation of the first and preceding. Work was not necessarily completed under each before the next was entered into. The objective of each remained that of fulfillment of the prime contract between the government and Bell Laboratories, which objective was the successful development of the Nike-Zeus Missile and all of its components, including ground direction and control. After development, if accomplished, there would follow production of the perfected missile and deployment into our defense system. It is very difficult for the untrained to conceive of the immensity of the total project, with a cost in billions of dollars.

It is the argument of Thiokol, that regardless of the total purpose of the prime contract remaining one of research and development, in its activity under its secondary subcontracts with Douglas, during the years 1963 and 1964, it had completed its research and development, had perfected its design and production of propellant and motors, and was engaged in manufacturing and delivering for sale an end product of its contracts. The fact that these products were being used in, and were components of the still experimental missile, was not material to its right of exemption.

It is without argument, in fact stipulated, that the stated purpose of the prime contract was research and development to the end of perfecting a Nike-Zeus missile. The stated purpose of the subcontract between the prime contractor and Douglas was research and development of components of the missile. The stated purpose of the secondary subcontract between Douglas and Thiokol was research and development, involving designing, developing, making, molding, qualifying, testing, and delivering rocket motors to Douglas, there to be further tested in conjunction with other designed and developed components, and ultimately to be combined and integrated with other components, designed and developed by other contractors, until the total components necessary were assembled into a missile. The missile as a whole would be tested to determine if it would perform as desired. If any component was not sufficient within its own design, or did not

function in relation to other components, further design, development, and testing would be required.

It is obvious that from its beginning in 1957 certain progress had been made in the project, and each contractor or subcontractor had accomplished many of the original objectives of design and development. Some phases of design and development were ended and others begun. Experimentation was continuing after incorporating perfected elements. Such procedure is elementary in any research and development project. The contract between Douglas and Thiokol, upon which appellee bases its contention that the research and development phase of its work had ended and a perfected manufactured product was being produced, is that numbered DAC 62–226. This is the "typical" contract. This contract contained a schedule and order for delivery of certain booster, vector and sustainer motors to Douglas. Such motors were of a certain description and model number and were to be delivered for certain purposes and according to a certain schedule. The exhibits in evidence disclose over two hundred such motors were delivered in 1963 and 1964.

Appellant, State of Alabama, insists that the facts related bring the assessment of sales and use tax squarely within the authority of the cases of United Aircraft Corp. v. O'Connor, 141 Conn. 530, 107 A.2d 398, 402, and Hamm v. Boeing Co., supra.

The case of United Aircraft Corp. v. O'Connor, supra, involved assessment of use and sales tax upon purchases of materials by United Aircraft in the fulfillment of five contracts between it and the Federal Government. United was a prime contractor and not a secondary subcontractor as in the instant case.

We quote from the opinion as follows:

" * * * The adverse claims of the parties sharpen the issue between them on this matter. The plaintiff maintains that the sales were not subject to a tax because they were purchased for resale. The defendant argues, on the other hand, that the sales are taxable because the personalty was not bought for resale but rather for experimental and research work to be performed under contracts primarily designed to obtain the technical skill of the plaintiff's engineering staff. We must turn, then, to the five contracts between the plaintiff and the federal government to determine whether they are contracts for services or contracts for sale of tangible personal property. The determinant is to be found in the intention of the parties to those contracts. That intention is to be ascertained from the language used, interpreted in the light of the situation of the parties and the circumstances surrounding them. Preston v. Verplex Co. 135 Conn. 187, 189, 62 A.2d 860; Ives v. City of Willimantic, 121 Conn. 408, 411, 185 A. 427. The following factors are significant: (1) The contracts, in describing the character of the work to be performed, frequently refer to it as 'experimental.' (2) The government reserved to itself the right to make changes in the drawings and specifications at any time during the experimental manufacture. (3) The plaintiff agreed to deliver to the government not only engines but also assembly specifications, blueprints of original experimental drawings, test reports, monthly progress reports, and descriptions of the design and construction of all new parts. (4) The government acquired the right to practice inventions arising out of the experimental services and to use the technical information delivered to it under the contracts. None of these factors would normally be the subject of agreement in a contract merely to manufacture and sell a specific article. * * *"

Based upon the precedent of United Aircraft Corp. v. O'Connor, supra, and the ominous presence of the total purpose of the prime contract being that of research and development, the State takes the position that all purchases under the contract were purchases for use by Thiokol primari-

ly for research and development, and the motors manufactured and delivered to Douglas were merely incidental.

We confess that on first view our consideration was hindered by the term—research and development—the case of United Aircraft Corp. v. O'Connor, supra, and the apparent holding of Hamm v. Boeing Co, supra. It was not until after much study of briefs, transcript and re-analysis of United Aircraft Corp. v. O'Connor, supra, on rehearing, that we became convinced the position of the State is wrong and is not supported by good reason or authority.

We will first dispose of United Aircraft Corp. v. O'Connor, supra. At the time of the decision in that case, Connecticut did not have in its sales and use tax statute a comparable provision as is found in our Title 51, Section 752(i) relating to purchases of property by a manufacturer which enters into and becomes an ingredient or component part of a product manufactured for sale. This is commonly called a manufacturer's exemption. Title 51, Sections 786(2) (i) and 787(d), Code of Alabama reads as follows:

"(i) The term 'wholesale sale' or 'sale at wholesale' means a sale of tangible personal property by wholesalers to licensed retail merchants, jobbers, dealers, or other wholesalers for resale and does not include a sale by wholesalers to users or consumers, not for resale. The term 'wholesale sale' shall include a sale of tangible personal property or products (including iron ore) to a manufacturer or compounder which enters into and becomes an ingredient of component part of the tangible personal property or products which he manufactures or compounds for sale, and the furnished container and label thereof."

These statutes contain two definitions of wholesale sales, with an exclusion. It was the second definition which was absent from Connecticut law at the time of O'Connor. Such a provision was enacted in Connecticut immediately following that decision and a contract remarkably similar to that of O'Connor was considered in the case of United Aircraft Corp. v. Connelly, 145 Conn. 176, 140 A.2d 486. The same court which rendered the opinion in O'Connor rendered a decision in Connelly that under the statute recently effective, the purchases by United Aircraft were exempt from tax as they became an ingredient or component part of a manufactured product to be sold.

It is true that the cases were distinguished by the court on the finding of facts in each, but since we can find no other case in any jurisdiction which follows United Aircraft Corp. v. O'Connor we question its soundness. There are other cases which refuse to follow it, though not repudiating it, upon a questionable distinction of facts. Comptroller of the Treasury v. Fairchild Engine & Airplane Corp., 227 Md. 252, 176 A.2d 210; Baltimore Foundry & Machine Corp. v. Comptroller, 211 Md. 316, 127 A.2d 368; Comptroller of Treasury v. Aerial Products, 210 Md. 627, 124 A.2d 805.

The problem we see in the O'Connor decision, other than the absence of a comparable statute, is that it fails to recognize divisibility of a contract as to phases of research and development and of manufacture and delivery of an end product. Its foundation was upon a finding of fact that the primary purpose of an experimental contract to develop and deliver aircraft engines to the government was to secure the skilled professional services of United Aircraft and the delivery of the engines was "merely incidental to the furnishing of personal services." Perhaps the facts there supported such a finding. If the question as presented in O'Connor, whether there was a sale for resale, was the only question raised in this case, the holding there might be more acceptable, but as in United Aircraft Corp. v. Connelly, supra, there is involved here a different statute and a different finding of fact by the court below.

We think the test of examining complicated contracts labeled experimental or research and development, but which require manufacture and delivery of end products, rather than delivery of only studies, reports, blueprints and specifications, to determine their primary purpose as opposed to an incidental purpose, as such test was stated in the O'Connor case, is not reasonable or practicable, when the phases or aspects of such contracts are easily divisible for accounting and tax assessment purposes.

The State contends that the Supreme Court of Alabama in Hamm v. Boeing Co., supra, approves of the decision in O'Connor and has adopted it as the rule in this State, and applicable to the case at hand. After much study of the opinion of Justice Simpson in Boeing, we do not reach such a conclusion.

The primary question decided in Boeing was that Boeing, as a contractor for the United States, though purchasing property, title to which passed to the government, was not such an agent of the government as to be entitled to governmental immunity from taxation. The secondary question was whether the sales to Boeing were sales for resale to the government and thus exempt as a wholesale sale.

The court rejected the second contention on the basis that the materials in question were not purchased for resale, but were used by Boeing in its research and development, though in some instances only briefly. It was in this context that the case of O'Connor was cited by the court. The determining factor was that the primary purpose in the purchase was *use by Boeing in the exclusively research and development phase* of its contract.

It is to be noted that the State in the Boeing case did not attempt to tax materials procured by Boeing to be fabricated or assembled by it into end-items which after fabrication or assembly were delivered to the government for its use, but only taxed items used by Boeing in performance of its research and development work. It therefore appears that the State recognized the divisibility of the functions of Boeing in pursuance of its contract, but now does not recognize this principle in the instant case.

It has been declared to be the underlying purpose and intent of the legislature in the enactment of the sales and use tax statutes to impose a tax upon the "ultimate consumer" based upon the amount of gross receipts of retailer to consumer. State Tax Commission v. Hopkins, 234 Ala. 556, 176 So. 210; Lone Star Cement Corp. et al. v. State Tax Commission et al., 234 Ala. 465, 175 So. 399; Haden v. McCarty, 275 Ala. 76, 152 So.2d 141.

The typical contract, DAC 62–226, required the manufacture and delivery of a specified number of motors on a designated schedule by Thiokol to Douglas Aircraft Company. These were motors which had been designed and devoloped by Thiokol since the receipt of the original contract some five years prior. They were the end product of five years of research and development. There may have been additional research and development proceeding during the term of DAC 62–226, however, it .was stipulated by the parties that all taxes due had been properly assessed and paid on purchases of materials other than those involved in the contested assessment. It was further stipulated that the purchases made the basis for the assessment went directly into and became ingredients or component parts of the motors manufactured and delivered.

It is clear that the motors manufactured and delivered were for the use of Douglas or the prime contractor. The manufacture and delivery of these motors was the culmination of a lengthy process of research, design and development by Thiokol and they were vital and necessary to be incorporated in the work of Douglas and Bell Laboratories to perfect an ABM missile.

Without delivery of hardware the total project failed. The fact that the motors may have been expended or consumed by Douglas and Bell in further research and development does not involve itself. We have determined the ultimate use of the purchases by Thiokol.

It may be contended that since there was no unit price designated in the contract there was no sale. We are not constrained to such a limited view. If there was a sale of professional skill in research and development, there was a sale of the manufactured product evolving from the research and development. The sales price was the cost of tangible personal property which entered into and became an ingredient or component part of the end product, plus an incentive fee for efficient production and meeting the schedule for delivery.

The testing by Thiokol of some of the motors manufactured as an agreed upon measure of quality control does not make them less a delivered manufactured product.

The other contracts involved in the assessment, which required the manufacture and delivery of specific hardware, fall even more clearly in the definition of a wholesale sale to a manufacturer.

In summary, we hold a contract providing for research and development evolving into manufacture and delivery of substantial designated end products is divisible for sales and use tax purposes, when the evidence is clear that specific purchases of tangible personal property made thereunder, entered into and became an ingredient or component part of tangible personal property manufactured for sale and delivery under the terms of the contract. To hold otherwise would be opposed to the principle that the sales and use tax is a consumer tax and is to fall upon the ultimate consumer.

We affirm the decrees of the court below.

Affirmed.