NAVIOS CORPORATION

v.

THE ULYSSES II, her engines, tackle, apparel, etc., and Compania Ulysses S.A., Panama, a corporation.

NAVIOS CORPORATION

v.

COMPANIA FLETERA CAJOTAMIL S.A., PANAMA, a corporation.

NAVIOS CORPORATION

v.

RIO AZUL COMPANIA ARMADORA, S.A., PANAMA, a corporation.

Nos. 3881, 3890, 3891.

United States District Court
D. Maryland.
April 30, 1958.

Hickey, New York City, and Ober, Williams, Grimes & Stinson, Robert W. Williams, Thomas W. Jamison, III, Baltimore, Md., for libelant.

Cardillo & Smith, New York City, Joseph Cardillo, Jr., Donald F. Mooney, New York City, Lord, Whip & Coughlan, George W. P. Whip, Baltimore, Md., for respondents.

THOMSEN, Chief Judge.

Libelant (Navios) filed these libels to recover damages for the alleged breach by respondents (Owners) of time charters covering three vessels, the Ulysses II, the Elpis and the Loida. Each of the charters contained the following war clause:

> "If war is declared against any present NATO countries, i. e., Belgium, Canada, Denmark, France, Iceland, Luxembourg, Netherlands, Norway, Portugal, United Kingdom, United States of America, Greece, Italy and Turkey, Owners or Charterers have the right to cancel this charter party upon completion of that particular voyage vessel is engaged upon."

On November 5, 1956, during the hostilities between Egypt and the United Kingdom and France following the nationalization of the Suez Canal, respondent Owners invoked that clause and canceled the charter parties. The issue now presented for decision is whether the condition permitting cancellation had occurred.

Navios contends: (1) The clause was operative only in the event of a declaration of war "in the well-known sense of those words in international relations." (2) Owners' notice of November 5, 1956, invoking the clause, was invalid because war had not been declared against any NATO country.

Owners contend: (1) (a) Since the clause appears in a commercial contract, it must be construed as ordinary commercial men would understand it, in the light of the purpose it was intended to accomplish; (b) so interpreted, it was

Kirlin, Campbell & Keating, New York City, Clement C. Rinehart, Walter P.

intended to mean that either party could cancel if any of the named NATO countries became involved in a war which would carry with it a substantial increase in freight market rates or otherwise offset either the owners' or the charterer's interest; (c) the United Kingdom and France were engaged in such a war. (2) Assuming, arguendo, that only a declaration of war would justify cancellation under the clause, war was declared by Egypt against the United Kingdom and France.

On the facts and for the reasons set out below, I have concluded: (1) The clause does not permit cancellation merely because one of the named NATO countries is engaged in war, or because a state of war exists between such country and another, whatever its effects. It permits cancellation only if war is declared, i. e. if there is a declaration of war against one or more of the named NATO countries; but those words should be interpreted as they would be understood by business men engaged in the shipping business in the United States, in the light of the purpose which the clause was intended to accomplish. (2) War was declared by Egypt against the United Kingdom and France, both in the ordinary sense of those words and in their technical sense in the field of international law.

### Facts

Libelant, Navios, is a wholly owned subsidiary of United States Steel, incorporated in Liberia, with an office in Nassau, Bahama Islands.

Respondents are three Panama corporations, owners respectively of the Liberian-flag vessels Ulysses II, Elpis and Loida. They have the same president and were represented by the same brokers and agents.

Time charters, one covering the Ulysses II for twelve months, one covering the same vessel for five years thereafter, and the other two covering the Elpis and the Loida respectively for five years, delivery to be made between various dates in 1956, were negotiated in New York in 1955 by brokers for Navios and brokers for Owners. While they were negotiating the terms of the first two charters, brokers for Owners asked for the inclusion in the charters of a broad war clause. Brokers for Navios replied that Navios would agree to the clause set out above, which they supplied, but would not agree to any other war clause. Owners accepted the clause, and it was included in all four charters.

In 1956 Egypt was nominally a republic, with a constitution providing for a legislature called the National Assembly. However, the National Assembly had not yet been organized, and the President exercised both executive and legislative powers.[1]

On July 26, 1956, Gamal Abdel Nasser, President of Egypt, nationalized the Suez Canal. The United Kingdom and France protested vigorously, and it was generally recognized that a serious crisis had been created.

On October 28 Israel mobilized its forces, and on October 29 invaded Egyptian territory. On October 30 the Chief of the United Nations Armistice Commission advised Israel that the invasion was contrary to the General Armistice Agreement and a Security Council cease fire order, and requested immediate withdrawal of the invading forces and a cease fire not later than noon of that day. The request for a cease fire was also transmitted to Egypt. No replies were received. A meeting of the Security Council was called, at which the United States submitted a resolution urging all members of the United Nations to observe the provisions of the Charter forbidding resort to force.

On the afternoon of the same day, October 30, the British and French governments formally called upon Egypt and Israel to stop all warlike action forthwith and to withdraw their forces ten miles

1. The Egyptian lawyers agreed that this was so, and it seems to be in accord with Art. 135 of the Constitution.

from the Canal. They also asked Egypt to agree that Anglo-French forces might move into key positions at Port Said, Ismailia and Suez to guarantee freedom of passage through the Canal. Egypt and Israel were asked to answer this communication within twelve hours; otherwise Anglo-French forces would intervene in whatever strength was necessary to secure compliance. The British and French proposals were accepted by Israel, but were rejected by President Nasser, who stated that the proposals violated Egyptian rights, dignity and sovereignty. The Egyptian position was communicated to the American, Soviet Indian and Yugoslavian Ambassadors.

On October 31, after the expiration of the twelve-hour limit, Anglo-French planes bombed Egyptian airfields from bases in Cyprus. That evening President Eisenhower, in a radio address to the American people, promised that the United States would not become involved in the "hostilities" and that he would endeavor to localize the "fighting" and end the "conflict". The United States Maritime Administration advised all American merchant ships to avoid the Suez Canal area "until the situation clarifies." The Security Council of the United Nations called an emergency session of the General Assembly under the "Uniting for Peace" provisions of the United Nations Charter.

On November 1, there were air raids on Ismailia, Fort Said, Suez and Alexandria. Egypt severed diplomatic relations with the United Kingdom and France by the following statement, which the Egyptian Deputy Foreign Minister read to the British and French Ambassadors:

"In view of military operations launched by Anglo-French armed forces against the Egyptian territory and people, considered as a flagrant and unjustified aggression, the Egyptian Government has broken off diplomatic relations with the Government of the United Kingdom and France. The decision is effective as from today."

Later on the same day, November 1, President Nasser made a formal speech to a large gathering of people in Cairo, which was broadcast throughout Egypt and was published under the title "Statement by President Gamal Abdul Nasser to the Egyptian People." He reviewed the military and diplomatic position from the Egyptian point of view, leading up to the following conclusion:

"And now fellow countrymen, while we face this situation: shall we fight or shall we surrender? In the history of nations, it is their struggle which writes their future. Days of crisis require more patience, confidence, faith and constancy until victory is achieved. Egypt has always declared that it shall fight in defense of its sovereignty and honour. Fellow countrymen, we shall fight the forces of tyranny which are aiming at the violation of our liberty. Brothers, we shall fight in the cause of Egypt's liberty, and in the cause of the liberty of the Egyptian people. We shall fight as we have always said in a total war in which the combatants are the people * * * the Egyptian people, side by side with their armed forces. Nations before us have fought against the powers of oppression which were superior in number and armaments, and they triumphed. * * * Yugoslavia fought with its small arms the armoured tanks of Germany and its airforces. Germany collapsed in the end, and Yugoslavia finally triumphed.

"Fellow Egyptians: We are fighting a bitter fight. We shall not yield in the defense of Egypt's liberty, honour and dignity. Each one of you, my brothers is a soldier in the National Liberation Army. Orders have been issued to deliver arms, and we have a big quantity of them. We shall fight in a bitter battle from village to village. Let each one of you, my fellow countrymen, be a soldier in the armed forces, so that

we may defend our liberty. Let our motto be: we shall fight and never surrender. We shall fight; we shall fight and we shall never surrender. Today, my brothers, we are writing a new page in the history of Egypt."

Several translations of the speech were offered in evidence, as well as the original Arabic text, published in the Cairo newspapers. Translation of this critical passage is difficult, because Arabic is not rich in words to express the fine distinctions argued by counsel in this case. The translation set out above was agreed to by the two Egyptian lawyers who testified for Navios and Owners respectively, except that one of them preferred the term "comprehensive war" to "total war" on the ground that it is closer to the Arabic original.[2]

On the same day the Egyptian government announced the closing of the Suez Canal, declared a State of Emergency throughout the Republic in accordance with Article 144 of the Constitution of Egypt,[3] seized all British and French property in Egypt, appointed Military Governors, and issued sequestration orders. All British and French nationals were required to register within three days.

Navios contends that President Nasser's speech was not treated as a declaration of war by Britain and France or by other nations. I have therefore read all portions of the official records of the United Nations, of Hansard, and of the Bulletins of the United States Department of State which have been marked by counsel for either party, keeping in mind in each case the position sought to be maintained by the speaker or the person issuing the statement.

In Britain, on the evening of November 1, Prime Minister Eden told the House of Commons three times: "There has been no declaration of war by us." Later he said: "We are in an armed conflict; that is the phrase I have used. There has been no declaration of war." The opposition attempted to force an admission that it was war, but the government insisted: "There is not a state of war, but there is a state of conflict."[4]

At the Emergency Special Session of the General Assembly of the United Nations that evening in New York, the Egyptian delegate referred to "acts of war", as well as to "acts of aggression".[5] The British delegate said it was a "police action", but representatives of Ecuador, India, Greece and Indonesia, as

2. A witness for respondents testified that she had heard the speech and that President Nasser used the expression properly translated "state of war" which had appeared in the declaration of war by Egypt against Germany in 1945. I find this testimony to be false.

3. "The President of the Republic may declare a state of emergency according to the law. Such a declaration should be submitted to the National Assembly within fifteen days of its announcement, and the Assembly takes whatever decision it deems necessary thereon. If the National Assembly is dissolved, such a declaration should be placed before the new Assembly when it meets at its first sitting."

4. In answer to questions from the opposition whether the Geneva Convention of 1949 governed the status of prisoners, the Prime Minister said that the Convention applied to "any state of armed conflict". "I repeat that the Geneva Convention applied in Korea although

there was no declaration of war. It was never admitted that there was a state of war, and Korea was never at war in any technical or legal sense, nor are we at war with Egypt now." Mr. Butler, Lord Privy Seal, stated under questioning by the opposition, "Her Majesty's Government do not regard their present action as constituting a war. * * * There is not a state of war, but there is a state of conflict." At one point he said: "I am perfectly satisfied that a state of war exists", but it appears from his whole statement that this was a slip of the tongue or an error in reporting. He stated that the United Kingdom had complied fully with the Hague Convention of 1907 by sending an ultimatum to Egypt before attacking.

5. Since the charter of the United Nations prohibits resort to "war", that word is seldom used in its debates, according to the expert testimony in this case. Such words as "hostilities" and "aggression" are customarily used instead.

well as representatives of Saudi Arabia and Libya referred to the "war" in Egypt. The United States called it a "violent armed attack", and both the United States and France referred to "belligerent forces" in the area.

The press of the world did not refer to President Nasser's speech as a declaration of war, but the press is seldom interested in such formal designations. The press generally referred to the fighting in Egypt as a war.

Early in the morning of November 2, 1956, the General Assembly adopted a resolution urging that "all parties now involved in hostilities in the area agree to an immediate cease fire * * *." Later that day, the Egyptian government accepted the resolution "on the condition of course that it could not implement the resolution in case attacking armies continue their aggression." President Nasser made a speech at the Al-Azhar Mosque, in which he stated that he had announced on behalf of the Egyptian people, Egypt's determination to fight the United Kingdom and France; that Egypt was fighting for her freedom and would never surrender. The State Department announced that the United States had stopped all shipments of military goods to the area of hostilities.

On the same day, Egyptian military forces sank ships in the Suez Canal, which blocked the Canal for many months.

On November 3 military operations continued. Britain, France and Israel declined to agree to a cease fire without assurance that forces of the United Nations would police the border between Egypt and Israel. The Information Department of the Ministry of National Guidance of Egypt issued a statement, which was distributed to the press by the Egyptian Embassy in Washington. The concluding paragraphs of this statement read:

"We are at war with Britain and France whose Armed Forces are attacking Egyptian civilians in towns and villages, destroying houses, hospitals, and places of worship, killing women and children without discrimination or mercy, and in a manner most repulsive to the civilized mind.

"War is raging between us and the Anglo-French, and between us and Israel. World public opinion is fully aware of the true facts of this situation."

The statement was published in many newspapers, including the New York Times of November 4, 1956.

At the meeting of the General Assembly of the United Nations on the evening of November 3, the Egyptian delegate again referred to "the war", as did the representatives of Arab and Communist nations. The delegate of the U. S. S. R. referred to the "flames of war", which must be "extinguished". The Indonesian delegate spoke of the need "to check the aggression, to stop war, and to restore peace in Egypt." Later he referred to "the war."

On Sunday, November 4, the General Assembly adopted a plan for organizing a police force of the United Nations to supervise a cease fire. At 4:00 p. m. the Secretary General reported that the Egyptian government had accepted that resolution, but it was rejected by Britain and France.

On Monday, November 5, armed forces of the United Kingdom and France landed on Egyptian territory near Port Said and commenced occupation of positions along the Suez Canal. In the resulting conflict with Egyptian armed forces, military and civilian personnel were killed and wounded and property in Egypt was destroyed. There was fighting in Port Said, Ismailia, Suez and several other localities, which continued through November 5 and November 6.

On November 5, after reading the statement of the Egyptian government published in the New York Times on Sunday, November 4, and considering the other developments, Owners' agent sent a cablegram from New York to Navios at Nassau, which, after referring to the

war cancellation clause in the charter parties, said:

"As You Doubtlessly Are Aware A State Of War Exists Between Egypt On The One Hand And The United Kingdom And France On The Other And This State Of War Officially Confirmed By The Egyptian Embassy At Washington D C Whose Statement In This Regard Specifically States In Part Quote We Are At War With Britain And France Unquote Stop In View Of These Circumstances And In Accordance With Owners Instructions We Hereby Advise You In Their Behalf That They Are Exercising The Aforementioned Option And Are Cancelling The Charter Parties Above Referred To Stop * * *".

Navios replied:

"* * * As There Has Been No Declaration Of War This Is To Advise That These Charters Must Continue In Full Force And Effect And That We Will Hold The Owners Responsible For All Costs And Damages Caused By Delay In Withdrawal Of Any Or All Of The Above Vessels * * *".

An exchange of messages followed, in which both sides adhered to the positions they had taken.

Also on November 5 Premier Bulganin of the U. S. S. R. warned the United Kingdom and France that their invasion of Egypt had raised the possibility of World War III and that the Soviet Union was determined to use force "to crush aggression and restore peace in the Middle East." The Israeli government notified the Secretary General of the United Nations that Israel "agrees unconditionally to cease fire" and that "all fighting had ceased between Israeli and Egyptian forces" since the morning of November 5. The British delegate to the United Nations reported that a cease fire had been ordered at Port Said on that day and that bombing would "cease forthwith throughout Egypt", and that "any other form of air action as opposed to bombing will be confined to the support of any necessary operation in the Canal area."

On November 6 Britain and France landed additional troops, but notified the Secretary General of the United Nations that they had ordered their forces to cease fire at midnight unless they were attacked.

On November 7 the General Assembly of the United Nations approved the second and final report of the Secretary General containing proposals to insure continuance of the cease fire by completing the organization of a United Nations force and its immediate dispatch to Egypt.

During the period October 29 to November 10, Egypt on the one hand and Allied Forces Headquarters, on the other, issued military communiques wherein they referred to each other as the "enemy".

These events had a severe impact on the shipping business. During the late summer, the British and French governments had requisitioned a large number of merchant vessels. Those requisitions and the general international tension created by the Middle East crisis had caused a rise in charter rates during the summer and fall of 1956. The actual blocking of the Canal on November 2 caused an immediate shortage of ships and brought about a sharp rise in freight rates, which reached a peak in December.

### Historical Background

It is a matter of common knowledge that war or a state of war may exist without a declaration of war. This has been recognized by many judicial decisions as well as in the writings of international law experts. Kawasaki Kisen Kabushiki Kaisha of Kobe v. Bantham S. S. Co., 1939, 2 K.B. 544, 63 Ll.L. 155; Stankus v. New York Life Ins. Co., 312 Mass. 366, 44 N.E.2d 687; Simon Benson, 1951 A.M.C. 585; Hamilton v. McClaughry, C.C.Kan., 136 F. 445, 449; New York Life Ins. Co. v. Bennion, 10 Cir., 158 F.2d 260.

Charles Cheney Hyde, a recognized authority, says: "War may in a broad sense be fairly described as a condition of armed hostility between states." This is in accord with a statement by Justice Grier, in the Prize Cases, The Amy Warwick, 2 Black 635, 666, 67 U.S. 635, 666, 17 L.Ed. 459: "War has been well defined to be, 'That state in which a nation prosecutes its rights by force'." On the other hand, John Bassett Moore, also a recognized authority, says: "By the term war is meant, not the mere employment of force but the existence of the legal condition of things in which rights are or may be prosecuted by force." It is evident that we are confronted with a choice between regarding "war" as primarily physical force or primarily legal status. Popularly, of course, the term war is given a very broad meaning.[6] In international law, however, the experts are inclined to equate "war" with "state of war". Thus, if one nation declares war against another, a state of war may exist before any force has been employed. On the other hand, force may be employed by one nation against another and yet no state of war may arise.

It has been noted that during the period between 1700 and 1900 there were nearly 150 wars, but only about twenty formal declarations of war, and that many of those were made after the commencement of hostilities. Stankus v. New York Life Ins. Co., supra; Simon Benson, supra; Phillipson, International Law and the Great War, p 53; Wilson, International Law, p. 245.

The Third Hague Convention, in 1907, required a prior declaration of war or its equivalent, a conditional ultimatum, and during World War I there were many declarations of war. Since World War I the principles of the Third Hague Convention have fallen into disuse. During World War II there were some declarations of war but also some attacks without a prior or subsequent declaration. The League of Nations condemned war, as does the Charter of the United Nations, and states often desire to avoid the opprobrium of accepting, by a declaration, responsibility for having established a state of war.

Hyde says that war can come into being in four ways: (1) by hostile acts with design of making war, (2) by any unequivocal act by which a state shows that it regards the act of another state as war, (3) by non-compliance with an ultimatum, and (4) by declaration of war.

### The Meaning of the Clause

The applicable rules of construction are well established. The words of the clause should be given their ordinary meaning unless the circumstances show that a different meaning was intended. Technical terms and words of art should be given their technical meaning unless the context or an applicable usage indicates a different mean-

---

6. Law dictionaries and dictionaries in general use in the United States define "declaration of war" as follows: 1 Bou.Law Dict., Rawle's Third Revision 1914: "The public proclamation of the government of a state, by which it declares itself to be at war with the foreign power mentioned, and which forbids all and every one to aid or assist the common enemy." Ballantine (1930 ed.): "A formal announcement or manifesto declaring the existence of a state of war." Black (4th ed. 1951): "A public and formal proclamation by a nation, through its executive or legislative department, that a state of war exists between itself and another nation, and forbidding all persons to aid or assist the enemy."

Webster (New Int'l, 2d ed.): "A formal announcement by a sovereignty or state of the beginning of hostilities against another, whether by a public proclamation, or, as formerly under primitive custom, by the mouth of heralds. The announcement may either precede or follow overt acts of hostility." Oxford: "Formal announcement or proclamation by a Power of the commencement of hostilities against another Power." See, also, 93 C.J.S. War and National Defense § 1 and cases cited; Julius Stone, Legal Controls of International Conflict, p. 304; Grob, The Relativity of War and Peace, pp. 16, 17, 222; Jackson v. Dreifontein Cons. Mines, Ltd., 1902 A.C. 484.

ing. Each charter party should be interpreted as a whole, and the circumstances accompanying the transaction should be taken into consideration. Restatement, Contracts, sec. 235. It is not necessary to invoke the secondary rules, set out in sec. 236.

The charter parties involved in these cases are time charters, providing for the employment of the several vessels over a period of years on stated terms. A charterer makes such a contract in order to insure, so far as practicable, that ocean transportation will be available at a predictable cost over the period covered by the charter. On the other hand, a shipowner frequently desires a broad war clause which will permit him to cancel the charter in order to take advantage of any substantial increase in freight rates or charter rates or to make up for increased operating expenses. In the instant case, Navios refused to accept the broad clause proposed by Owners and insisted upon the particular clause which was used.[7]

During the two decades before 1955 there had been a number of court decisions and arbitration awards interpreting charter parties and life insurance policies which contained such expressions as "in case of war involving", "if war breaks out involving", "engaged in war", or "act of war". See e. g. Kawasaki Kisen v. Bantham S. S. Co., 1939, 2 K.B. 544, 63 Ll.L. 155; Kawasaki Kisen v. Belships, 63 Ll.L. 175; Yankee Fighter, 1951 A.M.C. 579; Simon Benson, 1951 A.M.C. 585; Katrine Maersk, 1951 A.M.C. 324; New York Life Ins. Co. v. Bennion, 10 Cir., 158 F.2d 260.[8] These cases had produced varying inter-

pretations of the terms involved, and had shown how difficult it is to tell when "war" or "a state of war" exists, in the present era of border incidents, police actions, armed clashes, and brush-fire wars. In negotiating the charters involved in the instant suits, Navios insisted that the right of cancellation should arise only "if war is declared against" certain specified nations, so that the right to cancel would be narrow, and the test of the right to cancel would be as clear as possible.

Owners' arguments that the clause does not require a declaration of war, but permitted cancellation if any of the NATO countries became involved in a war which caused a substantial increase in freight rates, are not convincing. The clause which Owners wanted was not included in the contract. It is true that whether or not there was a declaration of war, the closing of the Suez Canal increased the rental value of the ships covered by the charters. But the clause insisted upon by Navios, agreed to by Owners, and included in the charter parties, permitted Owners to take advantage of such an increase only "if war is declared". On the other hand, the closing of the Canal and the increase in freight and charter rates lend equitable support to the argument that the clause should not be given a highly legalistic construction to defeat Owners' right to cancel.

The charter parties are commercial contracts and not international agreements such as treaties. The nature of the agreements and their context indicate that the phrase "if war is declared" should be interpreted as it would

7. If it were necessary to apply the canon *contra proferentem* it would apply against Navios, but I do not find that the clause is ambiguous. The real question is whether the condition was fulfilled, i. e. whether Egypt declared war against the United Kingdom and France.

8. Other insurance cases were: Weissman v. Metropolitan Life Ins. Co., D.C.S.D. Cal., 112 F.Supp. 420; Western Reserve Life Ins. Co. v. Meadows, 152 Tex.

559, 261 S.W.2d 554; Savage v. Sun Life Ins. Co., D.C.W.D.La., 57 F.Supp. 620; Rosenau v. Idaho Mut. Benefit Ass'n, 65 Idaho 408, 145 P.2d 227; West v. Palmetto State Life Ins. Co., 202 S.C. 422, 25 S.E.2d 475; Carius v. New York Life Ins. Co., D.C.S.D. Ill., 124 F.Supp. 388; Beley v. Pennsylvania Mut. Life Ins. Co., 373 Pa. 231, 95 A.2d 202; Thomas v. Metropolitan Life Ins. Co., 388 Pa. 499, 131 A.2d 202.

be understood by business men engaged in the shipping business. E. I. Du Pont De Nemours & Co. v. Claiborne-Reno Co., 8 Cir., 64 F.2d 224, 89 A.L.R. 238; Kawasaki Kisen v. Bantham S. S. Co., 1939, 2 K.B. 544, at 549, 558; Republic of China v. National Union Fire Ins. Co., D.C., 151 F.Supp. 211, 226, affirmed 4 Cir., 254 F.2d 177; Standard Oil Co. of New Jersey v. United States, 340 U.S. 54, 60, 71 S.Ct. 135, 95 L.Ed. 68.

I do not find, however, that there is any real difference between the way the phrase would be interpreted by business men and the way it would be interpreted by most specialists in international law.

### The Declaration of War

Each of the parties called as a witness an expert in international law. Navios called Dr. Philip C. Jessup, Professor of International Law at Columbia. Owners called Dr. Clyde Eagleton, who has since died, but who was Director of the International Law Institute and Professor of International Law at New York University, and who had made and published studies of declarations of war.[9] The experts agreed on many basic principles, but disagreed in the application of those principles to the facts of this case. Professor Jessup testified that under principles of international law, the various acts and events shown by the evidence do not constitute a declaration of war by Egypt against Britain and France or either of them. Professor Eagleton testified that in his opinion President Nasser's speech to the Egyptian people on November 1 constituted a declaration of war, which was confirmed by the statement of the Egyptian government on November 3. The experts used substantially the same authorities as the basis for their opinions, but Professor Eagleton applied the authorities more convincingly to the facts of this case; he took into account all of the relevant facts, and gave better reasons for his conclusion.

The experts agree that no special form of words is necessary to constitute a declaration of war. Oppenheim, 7th Ed., vol. 2, p. 294, n. 1, edited by Lauterpacht, who is now Judge of the International Court, says: "The form of words used in a declaration of war is immaterial so long as there is no doubt of the intention to declare war." However, a declaration of war cannot be inferred from a series of acts or statements; there must be a single statement, oral or written, to which one can point and say "this is the declaration of war." Such a statement must (1) emanate from a proper authority, (2) be publicly announced and communicated to the other governments, and (3) say that war exists or is intended to exist. A declaration may recognize a state of war already in existence. That is a frequent form in declarations, "doubtless accounted for by desire to put the blame on the other party, to declare that the war initiated by the opponent is accepted. This is the usual form of declaration by the United States." [10]

■ (1) The first requirement is that the declaration must emanate from a proper authority. However, if war is declared by the head of a state, no other nation can go beyond his statement and question his authority. This has been the established policy of the United States since Mr. Jefferson was Secretary of State.[11]

9. E. g. "The Form and Function of the Declaration of War" (1938), Am.Jour. of Int'l Law, vol. 32, No. 1, p. 19 et seq.

10. Eagleton, op. cit., p. 32.

11. Hyde, Int'l Law, 3d ed., vol. 2, p. 1215, citing Am. State Pap. For. Rel. I, 184. See, also, Moore, Dig., IV, 680–682 and documents there cited; Bernstein v. Van Heyghen Freres Societe Anonyme, 2 Cir., 163 F.2d 246, certiorari denied 332 U.S. 772, 68 S.Ct. 88, 92 L.Ed. 357; United States v. Watkins, 159 F.2d 50; Earn Line S.S. Co. v. Sutherland S.S. Co., D.C.S.D.N.Y., 254 F. 126; Naamloze Vennootschap v. Chase Nat. Bank, D.C. S.D.N.Y., 111 F.Supp. 833; Banco De Espana v. Federal Reserve Bank, 2 Cir., 114 F.2d 438.

The declaration in this instance was made by the man who was undoubtedly the Chief of State of Egypt, so this court should not inquire whether he had authority to make the statement. It appears, however, that he did have such authority.[12]

The Constitution does not require that a declaration of war be published in the Official Journal or in any other particular way. A declaration of a state of emergency, as authorized by Art. 144 of the Constitution, was issued and was published in the Official Journal. The decrees of November 1 were issued under that declaration, as the Constitution contemplated. A state of emergency may be declared because a state of war exists or because hostilities are raging in the country without a declaration of war or for many other reasons. The declaration of a state of emergency, therefore, does not prove or disprove that there has been a declaration of war, but the decrees entered pursuant thereto on and after November 1 were appropriate decrees to be entered if there was a state of war. Some of them were not appropriate otherwise.

(2) The experts are agreed that a declaration of war should be publicly announced and should be communicated. President Nasser's speech was undoubtedly a public announcement. It was carried in the press of all nations, including Britain, France and the United States. It is desirable that a declaration of war be delivered to the ambassador or other representative of the enemy, but this courtesy has fallen into disuse,[13] and I find from conflicting evidence that diplomatic relations had been broken before President Nasser made his speech. Dr. Jessup conceded that communication to a correspondent of the New York Times for publication would constitute a sufficient communication. Many declarations of war in recent years have had no more formal communication.[14]

(3) Dr. Eagleton interpreted the November 1 speech as saying that "war" existed or was intended to exist. Dr. Jessup disagreed. It is true that President Nasser did not use the same formal language used by King Farouk in 1945, but the intention seems to me to be clear. President Nasser was dealing with comparatively simple people, using a language which developed among nomadic tribes and nations, whose history has been very different from that of Britain and France. The word "war" was used only once during the speech, at the climax toward which the rest had been leading. Previously President Nasser had used such words as "aggression" and "attack", because they were better suited to his purpose of arousing the people to fight in a "total war".

Dr. Jessup questions whether the speech was a declaration of war because its language was hortatory. Even in western countries declarations of war are often hortatory.[15] The style of President Nasser's speech is in keeping with traditions which go back to a tribal chief posing to his warriors the question: "shall we submit to this affront?" and answering the question for them, as a prelude to battle.

The speech was misunderstood or disregarded by Prime Minister Eden, so the Egyptian government took pains on November 3 to issue a statement through its embassies to the press of the world, making clear that the speech of Novem-

12. See Art. 142, Art. 135 and Art. 139 of the Egyptian Constitution, and the testimony of the Egyptian lawyers referred to in note 1, above.

13. "Whether notification reaches the enemy does not seem of much consequence. The United States began the War of 1812 without allowing time for notice to reach England. Perhaps it may be assumed, with the improved communications of this day, that a proclamation made in one country will be immediately known in the enemy country." Eagleton, op. cit., p. 23.

14. Hyde, op. cit., p. 1216.

15. Eagleton, op. cit., pp. 33–34, quoting Maurice.

ber 1 had been intended as a declaration of war, and that a state of war existed.

Dr. Jessup stated that he did not believe President Nasser had intended his speech to be a declaration of war. He based his opinion in part upon the assumption that Egypt had not indicated to the United Nations that a state of war existed. This assumption, however, is contrary to the fact, for Mr. Loutfi, the Egyptian delegate, had repeatedly referred to the situation in Egypt as "war".

Another ground for Dr. Jessup's opinion was his belief that there were important reasons why Egypt would not wish to declare war against Britain and France: (a) it was undesirable under the United Nations Charter, (b) it would make Egyptian funds in Britain and France subject to confiscation as enemy property, and (c) it would have given Britain and France ground for wider military action than the limited objectives in the canal zone specified in the ultimatum of October 30. But, as Dr. Eagleton showed, Egypt had little to lose and something to gain by a declaration of war. (a) The Charter permits defensive war, and Nasser took the opportunity to characterize the British and French as aggressors. (b) Egyptian funds in Britain and France had been frozen when Egypt nationalized the Suez Canal Co., and the declaration permitted Egypt to sequester as enemy property British and French funds in Egypt. (c) Alexandria, Port Said, Ismailia and Suez had already been bombed, with loss of life and property. Other bombings had been threatened, unless Egypt permitted Anglo-French troops to occupy Egyptian territory. Nasser's political life was at stake; he was not proceeding cautiously.

It is true that Britain and France disclaimed any intention to make war on Egypt. So did the United States at the time of the Tampico incident, but the Mexican government issued a note in which it stated that "according to international law those acts of the armed forces of the United States must be understood as the initiation of war against Mexico." Dr. Jessup testified "that Mexico endeavored by that statement to pin the responsibility upon the United States for having waged war against Mexico; and in that sense it was a declaration of war in a rather familiar form, saying that war exists by act of the other side."

■ Navios argues that the United States and other neutrals did not consider that war had been declared or that a state of war existed, because they did not invoke neutrality acts and the like. However, the evidence shows that the war was terminated within a few days by the action of the United Nations, and of its member nations. Meanwhile the United States had acted to stop all shipments of arms. The fact that the war did not continue until other nations were drawn in or took formal action to show their neutrality does not prove that war had not been declared within the meaning of the war clause in the charter parties. Subsequent events cannot determine the propriety of Owners' action on November 5. They were entitled to act on the situation as it existed when they sent their notice of cancellation. See, by way of analogy, The Styria v. Morgan, 186 U.S. 1, 13, 22 S.Ct. 731, 46 L.Ed. 1017; The Wildwood, 9 Cir., 133 F.2d 765, certiorari denied Amtorg Trading Corp. v. American Foreign S. S. Corp., 319 U.S. 771, 63 S.Ct. 1436, 87 L.Ed. 1719.

Conclusion

■ I accept the conclusion of Dr. Eagleton that the speech of November 1, confirmed by the statement of November 3, constituted a declaration of war even under the technical requirements of international law. I am satisfied that it would be considered a declaration of war by business men generally engaged in the shipping business, and that it satisfied the requirements which the agents of Navios and of Owners had in mind when they negotiated the charter parties.

The libels, therefore, must be dismissed.