No. 20,812

RICHARD D. MEEHAN,
Appellant
v.
JOHN W. MACY, JR.,
Chairman, et al., Civil Service Commission, et al.,
Appellees

On Rehearing En Banc

Decided May 12, 1969

Before BAZELON, *Chief Judge,* EDGERTON, *Senior Circuit Judge,* DANAHER,* BURGER, WRIGHT, McGOWAN, TAMM, LEVENTHAL and ROBINSON, *Circuit Judges, sitting en banc.*

PER CURIAM: On April 18, 1968, a division of this court concluded that the agency which held the hearing on appellant's proposed discharge was warranted in finding that Charge 1 (conduct unbecoming a police officer) was sustained, but that the record did not contain adequate support for discharge on Charge 2 (failure to obey instructions) or Charge 3 (failure to obtain clearance for publication).[1] The division remanded to the District Court so as to permit agency reconsideration, in view of this court's ruling, of the sanction to be imposed on appellant.

On August 23, 1968, after the Supreme Court decided *Pickering v. Board of Education,* 391 U.S. 563 (1968), the same division of this court altered its order of re-

---

* Circuit Judge Danaher became Senior Circuit Judge on January 23, 1969.
1. Meehan v. Macy, —— U.S.App.D.C. ——, 392 F.2d 822 (1968).

mand so as to provide for reconsideration of appellant's case, on the merits, in light of the *Pickering* decision, and provision was specifically made for opportunity on remand for the introduction of further evidence.

Appellant had filed a petition for rehearing *en banc* to request reconsideration of the division's opinion in the light of *Pickering*. This court's granting rehearing *en banc,* and its order, had the effect of vacating the opinions and orders of the division. After hearing argument *en banc,* this court is of the view that the result reached in the division's orders was an appropriate disposition; it accordingly reinstates those orders to the extent that: (1) Charges 2 and 3 are dismissed; (2) Charge 1 is to be reconsidered in light of *Pickering;* and (3) if Charge 1, so reconsidered, is still found to be validly charged and proved, the penalty assessed is to be reconsidered in view of Charges 2 and 3 being dismissed.

Since proceedings on remand may result in additional evidence of record, and a different order entered by the executive authority, we see no occasion for a decision on the present record as to the implications of *Pickering* for Meehan.

The Commission may consider this an appropriate time to reconsider its precedents in view of *Pickering* and to establish general guidelines insofar as that may be feasible.

*So ordered.*

BARNES, J., dissenting:

I dissent because in my opinion (1) the Disciplinary Board of the Police Department had sufficient evidence before it to support its finding that Officer Brukiewa (and Officer Woodcock) had violated Section 12 of the Rules and Regulations of the Police Department of Baltimore City, and (2) no decision of the Supreme Court of the United States or of this Court requires us to re-

verse the decision of the Baltimore City Court sustaining the decision of the Board.[1]

## (1)

Rule 1 of the Rules and Regulations of the Police Department provides:

> " 'Any breach of the peace, neglect of duty, misconduct or any conduct on the part of any member of the Department, either within or without the City of Baltimore, which *tends to undermine the good order, efficiency, or discipline of the Department,* or *which reflects discredit upon the Department* or *any member thereof,* or which is *prejudicial to the efficiency* and discipline of the Department, even though these offenses may not be specifically enumerated or laid down, *shall be considered conduct unbecoming a member of the Police Department* of Baltimore City, and subject to disciplinary action by the Police Commissioner.' "

(Emphasis supplied.)

Section 12 of Rule 1 of the Police Department provides:

> "No member of the department *shall publicly criticize or ridicule* the *official action* of any member of the department, public official, judge or magistrate." (Emphasis supplied.)

In my opinion there was ample evidence before the Disciplinary Board to support its finding that the two officers violated Section 12 of Rule 1, which did "tend to undermine the good order, efficiency, or discipline of the

---

1. In addition to the two stated reasons for my dissent from the majority opinion, it should be noted that I am also dissatisfied with the majority's mere assumption of the validity of the Police Department's Rules and Regulations. I find that Rule 1 (including Sections 12 and 16) of the Police Department of Baltimore City is valid and constitutional. However, since the majority opinion has not passed on this issue, it is unnecessary for the purposes of the case that I detail the law and reasoning which lead me to this conclusion.

Department" and did "reflect discredit upon the Department" and a member thereof, and was "prejudicial to the efficiency and discipline of the Department." A violation of Section 12 is conduct which has been administratively determined by the Rule, itself, to tend to undermine the good order, efficiency, or discipline of the Department and is detrimental to that efficiency and discipline. It is "specifically enumerated" in Rule 1 and proof of public criticism or of ridicule of the official action of any member of the Department is sufficient to justify disciplinary action, including dismissal from the Force, against the officer found guilty of such a violation.

The excerpts from the newscast on Station WJZ-TV, Channel 13, June 19, 1968, stated in the majority opinion clearly indicate to me that both Officer Brukiewa and Officer Woodcock violated Section 12. They both "publicly criticized" the Police Department. Officer Brukiewa states emphatically that this is what they are doing. Officer Woodcock also "publicly criticized" the Police Commissioner himself indicating that Commissioner Pomerleau was not "a competent, effective Administrator." The 14 page "position paper" of the Police Union of which Officer Brukiewa was president and Officer Woodcock, a member of the Union's Executive Board, was referred to by Interviewer Gaul as follows: "Officer Brukiewa, *your* position paper is a *harsh indictment* of the City Police Administration" (Emphasis supplied.). Officer Woodcock "helped to prepare the position paper." This position paper "attacks everything from the changes in uniforms to the way Commissioner Pomerleau handled Baltimore's April riot."

Previously the commentator, George Baumann, had stated that the International Association of Chiefs of Police (I.A.C.P.) had studied the Baltimore Police Department some two and one-half years previously and as a result of that study "* * * the department was revamped from top to bottom. Almost every phase of police work and policy was altered to meet contemporary needs." It was stated that Police Commissioner Pomerleau was a

"consultant for the I.A.C.P. and since taking over the department has energetically tried to effect the I.A.C.P.'s recommendations" but that "restructuring of the department had caused concern in the ranks of the City Police * * *." Mr. Gaul then stated that this concern "is being aggressively voiced by the Police Union, which is estimated 1700 members, represent about half of the total force." The 14 page position paper is then mentioned and it "charges" that the I.A.C.P.'s recommendations "are a criminal waste of money and that those recommendations endanger the lives of police officers." When this is considered together with Officer Brukiewa's public statements that we feel definitely that this [the I.A.C.P. report] is "nothing to this City," that the morale of the Department has "hit its lowest ebb, right now" and that "the bottom is going to fall out of this City," it is difficult indeed to say that this broadcast was not a public criticism of the "official action of any member of the Department . . . ."

Counsel for the Appellants urge upon us that it was error for the Disciplinary Board to strike out the testimony of Ernest B. Crofoot, Council Director for the American Federal, State, County and Municipal Employees, A.F.L.-C.I.O. in Maryland. I rather agree that this was error on the part of the Disciplinary Board, but it was harmless error because as I read Mr. Crofoot's testimony, it is far more helpful in supporting the action of the Disciplinary Board than it was in supporting the position of the appellants.

Without considering Mr. Crofoot's testimony in detail, it indicated that the broadcast was deliberately and intentionally given by the two officers as representatives of the Union to overcome, in part, General Order 66-6 promulgated on July 21, 1966, by General George M. Gelston, Acting Police Commissioner, which stated in part that: "No organization, union or order has been recognized by the Baltimore City Police Department, and no such recognition is contemplated at this time." It further indicated that the dissatisfaction of certain segments of the public

with the conduct of the Police Department during the April riots would make the broadcast timely and effective.

In my opinion, the mere fact that Officer Woodcock, shortly before the hearing on this appeal, dismissed his appeal does not prevent this Court from considering his part and his public statements in the broadcast of June 19, 1968. The dismissal of his appeal by him does prevent us from reversing or modifying the action of the Disciplinary Board so far as he is concerned, but it does not in any way change the facts considered by the Disciplinary Board and by the trial court in regard to the nature, intent and scope of the broadcast. See *Rice v. City of St. Paul*, 208 Minn. 509, 295 N. W. 529 (1940) ; *Marvel v. Craft*, 166 Neb. 802, 219 N. W. 242 (1928). As Judge Sodaro aptly stated in his written opinion in the lower court:

> "Appellant Woodcock, who admittedly declared the Police Commissioner not to be a competent, effective administrator, a statement susceptible of no interpretation other than a reflection upon the ability and performance of Commissioner Pomerleau as police commissioner, *was interviewed with Brukiewa and supported him. This was a joint interview, the participants standing side by side in support of each other and mutually asserting sharp censure of the Department and its administration.*"
> (Emphasis supplied.)

This finding by the lower court is amply supported by the record and, in my opinion, should be accepted in this Court.

It is also my opinion that the trial court could take judicial notice of the unusual climate and temper of the people in Baltimore City at the time of the broadcast, resulting from the April, 1968, riots. See *Fox v. Grando*, 194 Md. 62, 69 A. 2d 795 (1950) — (judicial notice that in Baltimore City in 1937 and 1938 the real estate market

was in a depressed condition in marked contrast with conditions during the war years). See also *Huntt v. Govt. of the Virgin Islands,* 339 F. 2d 309 (1964, C.A. 3)—(judicial notice of the importance of tourism in the economy of Virgin Islands); *Navios Corp. v. The Ulysses II,* 161 F. Supp. 932 (D.C. Md., 1958), *aff'd* C.A. 4, 260 F. 2d 959, per curiam, upon Chief Judge Thomsen's opinion in the District Court—(judicial notice that a state of war may exist without a declaration of war); *King v. Celebrezze,* 223 F. Supp. 774 (E.D. Ky., 1963), *aff'd* C.A. 6, per curiam, 341 F. 2d 108 (1965)—(judicial notice that the period between 1945 and 1947 was a period of full employment); *Superior Trucking Co., Inc. v. United States,* 274 F. Supp. 196 (N.D. Ga., 1967)—(judicial notice of the growth of the City of Albany, Georgia over the years); *Young v. Lake Dearborn Corp.,* 7 Ill.App.2d 440, 129 N.E.2d 578 (1955), *cert. denied,* 352 U. S. 830, 77 S. Ct. 44, 1 L.Ed.2d 51—(judicial notice of the Chicago Fire and its destructiveness); 31-A C.J.S. "Evidence," §§ 60. 62, and 63, pages 34, 36-53.

The lower court properly considered these unusual circumstances in evaluating the effect of the utterances by the appellants upon the morale and discipline of the Police Department. The lower court, in my opinion, properly stated the following in its opinion:

> "While no testimony was offered concerning the temper of the City a relatively short time prior to the televising of the statements in question (and such evidence would have been difficult to introduce) the Court can and should take judicial notice of the unusual and unprecedented climate and explosive situation existing at the time of the utterances. It would be unrealistic to consider them in a vacuum. The Police department, as others in every metropolitan area in the country, was both praised and severely criticized, depending on the viewpoint of the observer. *In short, the department was on trial.*

"In April, the City suffered from unprecedented rioting, looting, fire bombing and destruction of property. A number of persons were killed, more than 700 injured, 1,000 businesses destroyed or damaged, and upwards of 5,000 were arrested. *The community was still in a state of shock. In this unwholesome atmosphere, the people required more than ever a bolstering of confidence that their police department could function effectively in an emergency.* Although the Police Department had given a good account of itself in the opinion of most informed observers, it had been the target of vitriolic attacks by angry people who had suffered losses in the April riots and those who would have used greater force in dealing with the trouble. *As never before, the Department urgently needed cohesion in its ranks and a rebirth of respect and confidence within the community.*

"It was in this explosive situation that the Appellants injected public statements that were given the widest circulation. Their utterances were corrosive of confidence in the Police Department and tended to widen the breach between the police and the public. The morale and discipline of the Department had to obviously suffer from the divisive effect of the statements. The Appellants then had a duty of loyalty to the Police Department, their employer, and a duty of temperate speech in consideration of the prevailing tense situation, as well as the obligation to comply with stated rules and regulations of the Department.

"The evidence is clear that these Appellants were highly critical of and heaped censure upon the Police Commissioner and the Police Department in their interview on television.

"The Appellants' contention of a failure of proof that their statements amounted to conduct

that tended to undermine the good order, efficiency or discipline of the Department or reflected discredit upon the Department is without merit. The Disciplinary Board that heard the evidence were superior officers of long tenure with substantial experience in the Police Department. The five members included the Chief of the Criminal Investigation Department with the rank of Lieutenant Colonel, an Assistant Chief of Patrol with the rank of Major, a Captain, a Lieutenant, and a Sergeant. They were eminently qualified by unique and special knowledge gleaned from many years in the Department to pass judgment upon the effects of the Appellants' statements on the morale and discipline of the Department. Certainly, they were in a better position to do so than the Court and counsel. *Their expertise is entitled to great weight.* It would be presumptuous for this Court to substitute its judgment and to hold that their findings and that of the Police Commissioner were not supported by substantial evidence." (Emphasis supplied.)

The trial court's conclusion that the Disciplinary Board's "expertise is entitled to great weight" is amply supported by the decisions of this Court. See *Bernstein v. Real Estate Commission of Maryland,* 221 Md. 221, 230, 156 A. 2d 657, 661-2 (1959), *appeal dismissed,* 363 U. S. 419, 80 S. Ct. 1257, 4 L.Ed.2d 1515, *reh. den.* 364 U. S. 855, 81 S. Ct. 35, 5 L.Ed.2d 79, and prior cases cited in the opinion in that case.

Inasmuch as the majority opinion assumes that the Rules and Regulations are valid on their face and I am of the opinion that they clearly are valid on their face, it is apparent to me that Section 12 of Rule 1 is a *specification* of conduct which "tends to undermine the good order, efficiency, or discipline of the department, or which is prejudicial to the efficiency and discipline of the de-

partment" and that such conduct "shall be considered conduct unbecoming a member of the Police Department of Baltimore City, and subject to disciplinary action by the Police Commissioner." This having been validly determined administratively by Rule 1, evidence establishing that a member of the department *did* publicly criticize or ridicule the official action of any member of the Police Department was all the evidence that was necessary to sustain the action of the Disciplinary Board in finding the officers guilty as charged. As I have already observed, there was, in my opinion ample and compelling evidence that the officers did publicly criticize the official action of a member of the department. In short, the circumstances of which Judge Sodaro took judicial notice (properly in my opinion) buttress and confirm what Rule 1 had already established (administratively) would be the effect of such public criticism.

In my opinion, the findings of the Disciplinary Board and by the Police Commissioner were amply supported by the evidence and their affirmance by the trial court should be affirmed by us.

### (2)

The remaining question to be considered is whether or not there is any decision of the Supreme Court of the United States or of this Court that requires us to reverse the decision of the lower court sustaining the Disciplinary Board. In my opinion, there is no such decision requiring us to reverse.

The majority has not cited any prior decision of this Court which, upon the principle of *stare decisis*, would require us to reverse the decision of the lower court sustaining the action of the Disciplinary Board, and I have found no such decision. On the contrary, the decisions of our predecessors rather indicate to me that we should affirm the decision of the lower court. See *Rogan v. Cook*, 188 Md. 345, 352, 52 A. 2d 625, 629 (1947), sustaining the dismissal of an assessor of Anne Arundel County for violation of a policy of the State Tax Commission against

assessors running for political office, in which Judge (later Chief Judge) Markell stated for the Court:

"No constitutional question is involved. Plaintiff had an unquestioned right to run for public office. But, as Mr. Justice Holmes said many years ago, a man 'may have a constitutional right to talk politics, but he has no constitutional right to be a policeman.' *McAuliffe v. City of New Bedford*, 1892, 155 Mass. 216, 220, 29 N. E. 517. If the tenure of assessors is to be made independent of political vicissitudes, the incongruity of soliciting one's neighbors' votes and assessing their property is too clear for elaboration."

See also *Hammond v. Lancaster*, 194 Md. 462, 483, 71 A. 2d 474, 485 (1950) involving the Subversive Activities Act of 1949, in which Chief Judge Marbury in his concurring opinion in that case, in which he was joined by Judge Collins, stated:

"Since Article 15, Section 11 of the Constitution applies not only to elective but also to appointive offices, the Legislature also considered it advisable to require a written statement, subject to the penalties of perjury, from each appointed employee. Sec. 13. This statement was to be to the effect that he or she was not a subversive person as defined in the statute. Among the complainants in the *Lancaster* case is Irene Diggs, who is a state employee, as a teacher in Morgan College. Although she does not say she will not or cannot make the statement required, the mere fact of her joining in the bill of complaint indicates that she does not think she ought to be required to make it, or possibly that she will lose her position by not making it. Under these circumstances, and in spite of the Supreme Court decision in the Hatch Act case, referred

to in the majority opinion, it would seem that she has enough interest to justify us in answering her question. We think she, and other people similarly situated, can be lawfully required to make such a statement. It is an arrogant assumption that a government cannot protect itself against the infiltration of those who desire to destroy it by force.

"It is also provided by the statute, (Sec. 11) that the appointing or employing officials of the State are permitted to decline to appoint or employ prospective employees if it is found under procedures to be established that there are reasonable grounds to believe such prospective employees are subversive persons. No one has a right to be a public employee. *McAuliffe v. Mayor,* 155 Mass. 516, 29 N. E. 517, (Justice Holmes). No fundamental rights are destroyed by not employing or by not keeping in public employment those who cannot or will not satisfy the appointing authority that they are not subversive persons. The citizens and taxpayers of the State, through their representatives, are entitled to decide who shall work for them and who shall teach in those schools and colleges which are State institutions supported by State funds."

Both *Hammond* and *Rogan* are mentioned in Note 3 of the majority opinion.

The inquiry is narrowed to a consideration of whether or not there are any decisions of the Supreme Court of the United States which require us to reverse the decisions of the lower court. I am of the opinion that there is no such decision.

The cases in the Supreme Court of the United States of *Garrity v. New Jersey,* 385 U. S. 493, 87 S. Ct. 616, 17 L.Ed.2d 562 (Jan. 16, 1967) and *Pickering v. Board of Education of Township High School District 205, Will*

*County, Illinois,* 391 U. S. 563, 88 S. Ct. 1731, 20 L.Ed.2d 811 (June 3, 1968), considered in the majority opinion, do not, in my opinion, require a reversal in the present case.

Considering *Garrity* first, it is clear to me that there was no *holding* by the Supreme Court in that case (a five to four decision) which requires a reversal in the instant case. Mr. Justice Douglas, speaking for a majority of the Supreme Court (himself, Warren, C.J., Black, Brennan, Fortas and Marshall, JJ.), states the holding to be: "We now hold the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office and that it extends to all, whether they are policemen or other members of our body politic." I assume that the last clause "or other members of our body politic" is *dictum* as such "other members" were not involved in the *Garrity* case. In any event, *Garrity* involved *criminal* proceedings and the use of what the majority of the Supreme Court considered "coerced statements" (in fact or in law?) as evidence in those criminal proceedings. It is apparent that the *Garrity* case is quite different from the case at Bar.

Even the famous statement of Mr. Justice Holmes when Chief Justice of the Supreme Judicial Court of Massachusetts in regard to policemen receives rather cavalier treatment in the majority opinion in *Garrity.* Mr. Justice Douglas stated:

> "Mr. Justice Holmes in *McAuliffe v. New Bedford,* 155 Mass. 216, 29 N. E. 517, stated a dictum on which New Jersey heavily relies:
>
> " 'The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman. There are few employments for hire in which the servant does not agree to suspend his constitutional right of free speech, as well as of idleness, by the implied

terms of his contract. The servant cannot complain, as he takes the employment on the terms which are offered him. On the same principle, the city may impose any reasonable condition upon holding offices within its control.' *Id.*, at 220, 29 N. E., at 517-518.

The question in this case, however, is not cognizable in those terms." (385 U. S. at 499, 87 S. Ct. at 619-20, 17 L.Ed.2d at 566-67). *Et tu Brute!*

There is, however, one *dictum* in the majority opinion — more reminiscent of the hustings than the bench — which, as the majority indicates, may have some possible relevance to the instant case. Mr. Justice Douglas stated:

"We conclude that policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights."
(385 U. S. at 500, 87 S. Ct. at 620, 17 L.Ed.2d at 567).

This may mean that as and when supposed rights of State and municipal policemen of free speech under the First Amendment to the Federal Constitution, as purportedly applied to the States through the Fourteenth Amendment to that Constitution, come before the Supreme Court of the United States, the First Amendment right of free speech with its federal gloss will be applied to such policemen. But the fact is that such a case *has not yet come before the Supreme Court.* In my opinion, this Court should not speculate in regard to what might be a possible result reached by a majority of the Supreme Court when such a case *does* arise, as the majority of this Court has done in the present case. Inasmuch as Mr. Justice Douglas in Note 5 of the majority opinion in *Garrity* cited at some length from a religious source in regard to arbitrary and forced confessions, it may not be inappropriate to quote from Holy Writ: "Sufficient unto the day is the evil thereof." Matt. 6:34.

I have grave doubts, in view of the rather devastating dissenting opinion of Mr. Justice Harlan (concurred in by Clark and Stewart, JJ.) and the separate dissenting opinion of Mr. Justice White in the *Garrity* case, that the Supreme Court will extend in any way the holding in *Garrity* or give effect to any of the *dicta* in the majority opinion in subsequent cases. Mr. Justice Harlan put it well, I think, when he stated in his dissenting opinion:

> "The majority is apparently engaged in the delicate task of riding two unruly horses at once: it is presumably arguing simultaneously that the statements were involuntary as a matter of fact, in the same fashion that the statements in *Chambers v. Florida,* 309 U. S. 227, and *Haynes v. Washington,* 373 U. S. 503, were thought to be involuntary, and that the statements were inadmissible as a matter of law, on the premise that they were products of an impermissible condition imposed on the constitutional privilege. These are very different contentions and require separate replies, but in my opinion both contentions are plainly mistaken, for reasons that follow."
> (385 U. S. at 501, 87 S. Ct. at 621, 17 L.Ed.2d at 568).

He then "makes a more comprehensive examination of the pertinent circumstances than the majority has undertaken" and shows, rather conclusively to my mind, that the statements by the New Jersey policemen were indeed voluntarily given and were not coerced *in fact,* as the trial court and the Supreme Court of New Jersey had found was the case.

When considering the blended theory that the statements were "involuntary as a matter of law," Mr. Justice Harlan stated:

> "What is really involved on this score, however, is not in truth a question of 'voluntariness' at

all, but rather whether the condition imposed by the State on the exercise of the privilege against self-incrimination, namely dismissal from office, in this instance serves in itself to render the statements inadmissible. Absent evidence of involuntariness in fact, the admissibility of these statements thus hinges on the validity of the consequence which the State acknowledged might have resulted if the statements had not been given. If the consequence is constitutionally permissible, there can surely be no objection if the State cautions the witness that it may follow if he remains silent. If both the consequence and the warning are constitutionally permissible, a witness is obliged, in order to prevent the use of his statements against him in a criminal prosecution, to prove under the standards established since *Brown v. Mississippi*, 297 U. S. 278, that as a matter of fact the statements were involuntarily made. The central issues here are therefore identical to those presented in *Spevack v. Klein, supra*: whether consequences may properly be permitted to result to a claimant after his invocation of the constitutional privilege, and if so, whether the consequence in question is permissible. For reasons which I have stated in *Spevack v. Klein*, in my view nothing in the logic or purposes of the privilege demands that all consequences which may result from a witness' silence be forbidden merely because that silence is privileged. The validity of a consequence depends both upon the hazards, if any, it presents to the integrity of the privilege and upon the urgency of the public interests it is designed to protect.

"It can hardly be denied that New Jersey is permitted by the Constitution to establish reasonable qualifications and standards of conduct

for its public employees. Nor can it be said that it is arbitrary or unreasonable for New Jersey to insist that its employees furnish the appropriate authorities with information pertinent to their employment. Cf. *Beilan v. Board of Education,* 357 U. S. 399; *Slochower v. Board of Education,* 350 U. S. 551. Finally, it is surely plain that New Jersey may in particular require its employees to assist in the prevention and detection of unlawful activities by officers of the state government. The urgency of these requirements is the more obvious here, where the conduct in question is that of officials directly entrusted with the administration of justice. The importance for our systems of justice of the integrity of local police forces can scarcely be exaggerated."
(385 U. S. at 506-508, 87 S. Ct. at 623-24, 17 L.Ed.2d at 571-72).

In my view, there is no logical answer to the position expounded by Mr. Justice Harlan and, I reiterate, that I find it most doubtful that the holding or any *dicta* in *Garrity* will be extended by the Supreme Court.

Considering *Pickering,* it need only be pointed out that a majority of the Supreme Court imposed upon the States the First Amendment free speech guarantee, with the federal gloss, in regard to the statements of a *school teacher* of a High School District in Illinois, and held that absent a showing that the statement made by the teacher contained false statements knowingly or recklessly made by him, he could not be discharged as a teacher by the Board of Education. In my opinion, there is quite a difference between the nature and character of the employment of a *teacher* and the nature and character of the employment of a *policeman* so far as First Amendment rights of free speech are concerned. A *teacher* in the public school system, by virtue of the position itself, is expected to stimulate and encourage

thought and discussion by his students of conflicting ideas in regard to public issues. He is expected to keep himself abreast of such issues, have opinions in regard to them and to express them fully and vigorously. He has no responsibility, as a general matter, for the enforcement of the criminal laws of the State or municipality. He is not part of a semi-military organization directly concerned with the preservation of the public safety and security. In the State employment spectrum, a teacher by the nature and character of his employment has the right to exercise the *maximum* of the right of free speech. On the other hand, a *policeman* is directly charged with the preservation of the public safety and security in a daily struggle with crime—organized and otherwise—upon which his life and limb, as well as the lives, bodies and properties of the citizens within the jurisdiction, depend. To accomplish this primary public duty, discipline and obedience to the orders of superiors are of the essence. This, of course, is the reason for the semi-military arrangement of Police Departments which like the Armed Forces must be prepared instantly to combat the forces of crime or the enemies of the Republic. Not only is discipline a vital and necessary element in a successful effort by the policeman in this regard, but the orders and business of the Police Department must be kept confidential in order that the criminal elements will not be apprised of the intended procedures of the Police Department for the suppression of crime and thus more easily circumvent them. In short, the policeman by the nature and character of his public employment has the most qualified and limited freedom of speech. Mr. Justice Marshall, in his opinion for the majority of the Supreme Court in *Pickering*, suggests this distinction when he stated:

"* * * The statements are in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher. *Thus no question of main-*

*taining either discipline by immediate superiors
or harmony among coworkers is presented here."*
(Emphasis supplied.) (391 U. S. 569-570, 88
S. Ct. at 1735, 20 L.Ed.2d at 818).

Moreover, in Note 3 to the majority opinion, Mr. Justice Marshall states:

"3. It is possible to conceive of some positions
in public employment in which the need for confidentiality is so great that even completely correct public statements might furnish a permissible ground for dismissal. Likewise, positions
in public employment in which the relationship
between superior and subordinate is of such a
personal and intimate nature that certain forms
of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between
them can also be imagined. We intimate no
views as to how we would resolve any specific
instances of such situations, but merely note
that significantly different considerations would
be involved in such cases." (391 U. S. at 570, 88
S. Ct. at 1735, 20 L.Ed.2d at 818).

It is, in my opinion, clearly indicated that as and when
the First Amendment rights of a policeman come
squarely before the Supreme Court in a factual setting
similar to that in the instant case, the State's power to
remove or otherwise discipline the offending policeman
will be vindicated.

The majority indicates that "If the Supreme Court's
opinion in *Pickering* is read with the word 'policeman'
substituted for teacher, and with full consideration being given to the differences between the operation of
schools and the operations of a police department and
the State's interest in a disciplined and efficient police
department, we cannot escape the conclusion that the Supreme Court, were the case before us before it, would

hold that Brukiewa did not go beyond the bounds of permissible free speech and that the State cannot discipline him for what he said." As I have already stated, it is clear to me that the word "policeman" cannot be substituted for the word "teacher" in *Pickering*. As I see it, this would be tantamount to substituting "apples" for "grapefruit," all "fruit" to be sure, but quite different fruit indeed. I am quite convinced, for the reasons stated, that the Supreme Court will not make the "substitution," as and when the case of the policeman comes before it. I, therefore, am of the opinion that the decision in *Pickering* does not require us to reverse the trial court in the present case.

For the same reasons, I am of the opinion that the decision of the United States Court of Appeals for the District of Columbia in *Meehan v. Macy*, (C. A. D. C. 1968) 392 F. 2d 822, fully sustains the decision of the lower court in the instant case, and that any reconsideration of the opinion in the *Meehan* case by the District Court in the light of *Pickering* will most certainly not result in any modification of the *Meehan* opinion. My opinion is fortified in this regard by the strong dissenting opinion of Circuit Judge Danaher (concurred in by then Circuit Judge, now Chief Justice, Burger and Circuit Judge Tamm) and the equally strong dissenting opinion of Circuit Judge Tamm (concurred in by then Circuit Judge, now Chief Justice, Burger and Circuit Judge Danaher) to the per curiam order of the United States Court of Appeals for the District of Columbia, sitting En Banc, in *Meehan*, referred to in the majority opinion in the present case. These forceful dissents clearly indicate to me that the decision of the Supreme Court in *Pickering* can have no effect upon the decision in *Meehan* and that the District Court upon the remand will most likely so hold.

The majority correctly observes that the criticism by the police officer in *Meehan* of the Governor of the Panama Canal Zone was more offensive and provocative than was the criticism of the police officers involved in the

present case. As I see it, however, these considerations go to the question of *punishment* and not to the question of *guilt, vel non,* and it is clear that the police officer in *Meehan* received the highest punishment, *i.e.,* that of discharge from the service, whereas, in the instant case, the officers received very mild punishments indeed, already stated in the majority opinion. Guilt was determined by a finding of public criticism; punishment was applied by a consideration of the surrounding circumstances of such criticism.

Another reason why, in my opinion, we should not *extend the holdings* or give effect to any *dicta* in either *Pickering* or *Garrity* is the fundamental and unfortunate error by the Supreme Court of the United States in extending various provisions of the first eight amendments to the Federal Constitution as constitutional limitations upon the States; with federal interpretations, allegedly through the provisions of the Fourteenth Amendment. I have expressed my opinion in regard to this grievous error in prior dissenting and concurring opinions. *Miller v. State,* 251 Md. 362, 383, 247 A. 2d 530, 541 (1968) ; *State v. Giles,* 245 Md. 342, 660-669, 229 A. 2d 97-102 (1967) ; *Truitt v. Board of Public Works,* 243 Md. 375, 411, 221 A. 2d 370, 392 (1966) ; *State v. Barger,* 242 Md. 616, 628, 639-644, 220 A. 2d 304, 311, 317-319 (1966) ; *Montgomery County Council v. Garrott,* 243 Md. 634, 650, 653, 222 A. 2d 164, 172, 176 (1966) ; and *Hughes v. Maryland Committee for Fair Representation,* 241 Md. 471, 491-513, 217 A. 2d 273, 285-298 (1966). I merely refer to these opinions for what, in my opinion, is indicative of the error into which the Supreme Court has fallen and the urgent necessity for the correction of that error either by the Supreme Court itself or by congressional action under Section 5 of the Fourteenth Amendment or under Article III of the Federal Constitution.

Finally, we should decline to extend the new federal First Amendment concepts as imposed upon the States because of the substantial departure by the Supreme Court from the doctrine of *stare decisis* in the last two decades. As pointed out in the majority opinion, the Su-

preme Court, itself, only 22 years ago sustained the Holmes observation in *McAuliffe*, in *Adler v. Board of Education*, 342 U. S. 485, 72 S. Ct. 380, 96 L. Ed. 517 (1952), in sustaining the Feinburg Law in the State of New York in regard to the denial of employment in the public schools of that State of persons advocating the overthrow of the government by force or violence. This fully argued case, in which Vinson, C.J. and Reed, Jackson, Burton, and Clark, JJ., joined in the majority opinion of Mr. Justice Minton, (Frankfurter, Black and Douglas, JJ., dissenting) was in effect overruled, as the majority opinion in the instant case points out, by the Supreme Court in *Keyishian v. Board of Regents*, 385 U. S. 589, 87 S. Ct. 675, 17 L.Ed.2d 629 (1967), and the statute sustained in *Adler* was held unconstitutional some 15 years later in *Keyishian*, in a five to four decision with a majority opinion by Mr. Justice Brennan, joined by Warren, C.J., and Black, Douglas and Fortas, JJ., and a dissenting opinion by Mr. Justice Clark, joined by Harlan, Stewart and White, JJ. This astounding departure from the doctrine of *stare decisis*, which, in my opinion, is the basic doctrine of responsible judicial process, should most certainly not be encouraged by us by an *extension* of decisions which depart from the prior holdings of the Supreme Court, itself. In so doing, as I see it, the majority is in error.

I would affirm.